IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MIMEDX GROUP, INC.,

      Plaintiff,

   v.

FRASER JOHN PERRING; GABRIEL
BERNARDE; AIDAN LAU; GANADABI
LTD., and DOES 1-100, inclusive,

      Defendants.

Case No.

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL

Plaintiff MiMedx Group, Inc. ("MiMedx") hereby complains and alleges against Fraser John Perring, Gabriel Bernarde, Aidan Lau, Ganadabi Ltd., and Does 1-100, inclusive ("Defendants") as follows:

## NATURE OF THE CASE

1.     This case involves a blatant "short and distort" market manipulation conspiracy against MiMedx by a cabal of short sellers and those in their employ, including Defendants. While short selling is an entirely legal pursuit when accomplished in accordance with governing laws, rules, and regulations, a short seller may not engage in fraudulent or manipulative conduct in an effort to ensure that its bet will pay off. It is precisely that illegal conduct that Defendants have engaged in here. Indeed, in an all-out effort to ensure that they and/or their financial backers would profit from their negative investments, Defendants have maliciously disseminated materially false, misleading and defamatory statements about MiMedx and its employees to MiMedx's customers,

1

shareholders and the investing public. This campaign of disinformation was intended to fraudulently undermine public confidence in and manipulate the market for MiMedx's stock, so as to allow Defendants and/or their financial backers to reap enormous profits from the resulting price decline.

2.     Defendants' attempts to profit at the expense of MiMedx, its employees, its customers, and its stockholders (including the numerous pensioners, retirees and other individuals who invest in the company through institutional funds) are both libelous and violative of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Defendants must be permanently enjoined from such manipulative acts and ordered to pay damages for their conduct.

3.     As background, MiMedx is a global processor, marketer, and distributor of medical products. MiMedx began trading publicly in 2008 and was listed on the NASDAQ exchange in 2013. Recently, MiMedx was ranked #5 on Fortune Magazine's 2017 "Fastest Growing Companies" list. MiMedx has also been consistently recognized by Georgia Trend Magazine as one of "Georgia's Top 100 Public Companies" and was honored by the Association for Corporate Growth as one of its "Georgia Fast 40" companies, recognizing the top 40 fastest growing middle-market companies in the state. As its business flourished, its stock price steadily rose from approximately $3/share to a high of approximately $17.50/share.

4.     Beginning in or around late 2016 and continuing into 2017, MiMedx noticed an increasing number of bearish trades in its stock (i.e., bets that the stock price will decline; usually in the form of a short sale, the purchase of a "put" option, or the sale

of a "call" option), piling up at a rate much higher than usual. Despite the negative pressure exerted by these trades, MiMedx's stock price continued to rise.

5.     When the price of a stock rises against a trader's short position, a phenomenon called a "margin call" can occur. In the context of short selling, a margin call is when the entity who has lent stock to the trader so that the trader can short sell it— intending to purchase it back later for a lower price, returning it to the lender and pocketing the difference—requires the trader to put up additional money as collateral to cover his or her potential losses from the rising stock price. Rather than do so, many traders will exit their short position by repurchasing the stock, thereby causing the price to go even higher. This can trigger a second, related phenomenon called a "short squeeze," which takes place when a large number of short sellers are forced to cover their positions in a small period of time. The rising price of MiMedx stock therefore posed a significant threat to the trading positions of its short-sellers.

6.     Not coincidentally, to eliminate a possible margin call and/or short squeeze, the short sellers and those working with them, including Defendants, soon began an attack on MiMedx in the form of a "short and distort" market manipulation campaign, aiming to bring MiMedx's stock price down.[1] These attacks manifested themselves in early September 2017, when a short seller and hedge fund manager named John

---

[1]     A "short and distort" scheme is an illegal practice employed by unethical internet investors who short-sell a stock and then spread unsubstantiated rumors and other kinds of unverified bad news in an attempt to drive down the equity's price and realize a profit. The Securities and Exchange Commission has stated that the use of a "short and distort" scheme "is particularly insidious because it harms investors by distorting the information they use to make investment decisions;" *i.e.*, by manipulating the market. https://www.sec.gov/news/press/2008/2008-64.htm (last visited Jan. 17, 2018).

Fichthorn spearheaded the effort by calling a major MiMedx shareholder to malign the company. Fichthorn's efforts led the shareholder to sell approximately one million shares of the company's stock, dramatically manipulating the stock price.

7.      Then, following Fichthorn's lead, two pseudonymous internet personas calling themselves "Aurelius Value" and "Viceroy Research" posted simultaneous "hit pieces" on September 20, 2017, making many of the same false and defamatory statements that they had formulated in cooperation with Fichthorn and that Fichthorn had conveyed to MiMedx's shareholder. "Viceroy Research" was the pseudonym assumed by Defendants in attacking MiMedx (as well as a host of other publicly-traded companies). Defendants went on to publish at least twenty subsequent defamatory articles concerning MiMedx, all of which sought to maintain continuous downward pressure on the company's stock price.

8.      Defendants are not journalists, but profiteers and market manipulators with admitted short interests in MiMedx's stock. As part of their disinformation campaign, Defendants made numerous false, misleading and otherwise defamatory statements about MiMedx, intending to benefit themselves by preventing margin calls and a possible short squeeze and, further, producing large profits for themselves and MiMedx's other short sellers at the direct expense of the company and its interest-holders (to say nothing of the reputational harm inflicted on MiMedx).

9.      MiMedx has an obligation to police and combat the dissemination of false, misleading and injurious statements made by stock traders seeking solely to enrich themselves at the expense of MiMedx, its employees, and its shareholders. Stock market analysts follow negative online commentary regarding the company and may be

4

influenced by the same.  Thus, MiMedx has enforced, and will continue to enforce, its right to be free of such false, misleading and injurious statements.

10.     Given the foregoing, MiMedx seeks damages for Defendants' wrongful and defamatory conduct, including reasonable attorneys' fees and punitive damages as permitted by law, as well as injunctive relief to prevent Defendants from further disseminating their deceptive, unfair, false and misleading statements about MiMedx.

## PARTIES, JURISDICTION, AND VENUE

11.     Plaintiff MiMedx Group, Inc. is a Florida corporation with its principal place of business at 1775 West Oak Commons Ct. NE, Marietta, GA 30062.  MiMedx is publicly-traded on the NASDAQ exchange under the ticker symbol MDXG.

12.     Upon information and belief, Defendant Fraser John Perring is an individual domiciled in the United Kingdom.

13.     Upon information and belief, Defendant Gabriel Bernarde is an individual domiciled in Australia.

14.     Upon information and belief, Defendant Aidan Lau is an individual domiciled in Australia.

15.     Upon information and belief, Defendant Ganadabi Ltd. is a private company limited by guarantee, formed and existing under the laws of the United Kingdom.  Ganadabi is the corporate entity through which Defendants conduct their defamatory activity as "Viceroy Research;" Perring, Bernarde and Lau are its sole principals.  In January 2018, a pair of investigative journalists discovered that Defendants were responsible for the Viceroy publications, which until then had been published anonymously.  At around the same time, having been unmasked or knowing that they

5

were about to be unmasked, Defendants admitted their identities as the individuals behind Viceroy. Attached hereto as Exhibits 1-3 are various news articles detailing Defendants' responsibility for the Viceroy publications.

16.     MiMedx is unaware of the true names and capacities of the defendants named herein as Does 1 through 100, inclusive, and therefore names said defendants by such fictitious names. MiMedx will seek leave to amend this complaint when the true names and capacities of said defendants have been discovered. MiMedx is informed and believes, and thereon alleges, that each of said fictitiously named defendants is responsible for the acts which resulted in the harm to MiMedx alleged herein.

17.     Upon information and belief, each of the Defendants herein was the agent and/or co-conspirator of each of the remaining Defendants in the "short and distort" scheme alleged herein, and in doing the things alleged herein, was acting within the course and scope of that agency, employment, and/or conspiracy.

18.     This Court has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1332, as the parties are entirely diverse of citizenship and the amount-in controversy exceeds $75,000.00. Specific damages suffered by MiMedx to protect its interests against Defendants include the expense of responding to Defendants' repeated false and injurious accusations in the public domain (*e.g.*, writing and posting rebuttals to MiMedx's public website); the expense of retaining an investigator to identify Defendants, prior to their public unmasking; and attorneys' fees incurred in coordinating these and other litigation activities against Defendants. These damages greatly exceed the jurisdictional minimum. Furthermore, by this action MiMedx seeks a permanent injunction against Defendants to halt their wrongful conduct. The value to MiMedx of

such an injunction also greatly exceeds the jurisdictional minimum given the significant sums of money MiMedx would continue to expend to maintain its reputation in light of Defendants' false attacks.

19.     This Court has personal jurisdiction over the internationally-domiciled Defendants, and each of them, because their intentional torts described herein were directed toward and had their harmful effects on MiMedx, which is a Florida citizen. *Calder v. Jones*, 465 U.S. 783, 790 (1984); *Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir. 2008).

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3).

## GENERAL ALLEGATIONS

### Defendants' Defamatory Articles

21.     On September 20, 2017, Defendants published their first article concerning MiMedx on the Viceroy Research website, http://www.viceroyresearch.org. Defendants went on to publish another twenty defamatory articles about MiMedx. Defendants expressly admitted, in a preface to each article, as follows:

> As of the publication date of this report, you should assume that the authors have a direct or indirect interest/position in all stocks (and/or options, swaps, and other derivative securities related to the stock) and bonds covered herein, and **therefore stand to realize monetary gains in the event that the price of either declines**. The authors may continue transacting directly and/or indirectly in the securities of issuers covered on this report for an indefinite period and may be long, short, or neutral at any time hereafter regardless of their initial recommendation [emphasis added].

Upon information and belief, Defendants were also being paid by others to act as "shills" for the cabal of short-sellers in MiMedx's stock. In both ways, Defendants had a clear and admitted personal interest in seeing MiMedx's stock price decline. Attached hereto

as Exhibits 4-26 are copies of Defendants' articles concerning MiMedx, through the date

of filing of this Complaint.

22.     Though crassly written, Defendants developed a myriad of unfounded

allegations and innuendoes with which to attack MiMedx.  Defendants' false and

defamatory statements would be too numerous to describe herein, but can generally be

categorized in four ways, with specific examples of each set out below:

> (1)     False allegations that MiMedx has purposely taken on employees that
> directed fraudulent sales practices at prior companies so as to import those
> fraudulent practices to MiMedx, or that Defendants have procured evidence
> proving that MiMedx has engaged in such practices;
>
> (2)     False allegations that MiMedx has falsified certifications or otherwise
> skirted government regulations in its dealings with government customers, as
> allegedly evidenced by unrelated lawsuits;
>
> (3)     False allegations that MiMedx sells its products through related entities or
> physician-owned distributors to facilitate bribery and kickback schemes in
> contravention of federal law; and
>
> (4)     False allegations that MiMedx has committed Medicare fraud through
> various schemes including "up-coding" and/or manipulation of "Q-codes."

In each case, Defendants knew that their statements and suggestions concerning MiMedx

were false, and purposely avoided the truth by publishing them anyway.

*Statements Concerning Fraudulent Sales Practices*

23.     One of the primary themes in Defendants' articles concerned previous

allegations of kickback and bribery at a company called Advanced BioHealing ("ABH"),

an entirely separate company from MiMedx.   ABH was accused of running a

kickback/bribery scheme to induce sales of its medical products before it was purchased

by Shire Pharmaceuticals, LLC ("Shire") in 2011.   Defendants falsely suggested that

MiMedx must be running a similar scheme, solely because it hired staff that previously worked for Shire (not necessarily ABH). This could not be further from the truth.

24.     One way in which Defendants attempted to draw a false connection between MiMedx and ABH was to purport to identify an "incestuous hiring policy" between the two companies, where MiMedx hired the former ABH employees and placed them in "senior employment positions." However, there is nothing "incestuous" about hiring employees from another company in the same industry (particularly since MiMedx did not actually hire any employees directly from ABH, but from Shire). MiMedx vetted all of the former ABH employees it hired and found that none had been engaged in wrongful conduct at ABH, which Defendants knew or would have found out had they done any reasonable investigation. And contrary to Defendants' statement, not a single former ABH employee is in a position above middle management at MiMedx.

25.     Defendants then specifically stated that MiMedx hired a former ABH employee named Sean McCormack because he was an "instrumental figure" in the ABH kickback scheme, and that MiMedx's investors should be concerned about their investments given his involvement with the company. Defendants maliciously called McCormack the "$350-million-dollar man [sic]" on multiple occasions in order to falsely draw a further connection between McCormack and the wrongful kickback scheme, which ultimately caused Shire to pay a $350 million settlement. These statements were made in a knowing and tortious attempt to defame McCormack, and to suggest that MiMedx was engaged in or seeking to engage in similar fraudulent conduct simply by virtue of the fact that it hired McCormack.

26.     Defendants' statements were false because McCormack had absolutely no involvement in the alleged ABH kickback scheme. He was never charged or found guilty of any wrongful behavior, either in a criminal or a civil capacity, and was not even interviewed by investigators in connection with the criminal investigation. Instead, the criminal investigation into ABH yielded indictments for four individuals—Todd Clawson (National Director of Federal Markets Division); Keith O'Brient (Senior Vice President, North American Sales); Charles Anthony Ezell (National Sales Director); and Nicolo Rallo (National Sales Director)—all of whom pleaded guilty, and none of whom have any involvement in MiMedx. A brief review of the Ezell and Rallo plea agreements, which are publicly available in the very same or related cases to those which Defendants cite in their article(s), show that each acknowledged that the members of the kickback scheme were these four individuals, and did not identify anyone else at all, much less did they identify McCormack. Indeed, at or near the time of the ABH kickback scheme, McCormack was promoted out of his position as National Sales Director at ABH precisely in order to ensure that his ethics would not present a roadblock to the unethical activities of the other sales staff involved in the scheme. He was replaced in that position by Rallo, specifically so that the scheme could take place without his involvement.

27.     Despite the clear documentation showing Clawson, O'Brient, Ezell, and Rallo to be the wrongdoers in the ABH scheme, Defendants barely mentioned them in their article(s). No reference was made to the fact that any were even charged with a crime except Clawson, and the only statement concerning O'Brient and Ezell was that they conducted a single training session on sales (along with McCormack, which was not surprising or concerning given that at the time O'Brient was the Vice President of Sales,

Ezell was the Western Sales Director and McCormack was the Eastern Sales Director). Rallo was not mentioned at all, even though he was specifically chosen to replace McCormack so that McCormack's ethics would not be an obstacle to the kickback scheme. These purposeful omissions—when the actual facts were obviously available to Defendants in the very plea agreements they referenced in their articles—were a malicious attempt to twist the facts of the ABH investigation to fit Defendants' intended narrative that McCormack was an "instrumental figure" in the scheme, and therefore that the scheme carried over with him to MiMedx. That narrative is simply false.

28.     Elsewhere in their articles, Defendants included other statements misleadingly implying that McCormack was guilty of malfeasance, which are actionable even though Defendants couched their statements by stating that McCormack "stood accused" of the kickback and bribery allegations at ABH, or that he was "named" as a "key influence" in the scheme. One specific allegation Defendants relied on to support these false suggestions is that McCormack "made false or fraudulent claims" for medical products and services to Medicare, Medicaid, and TRICARE programs from July 2008 to January 2011. The problem with repeating such claims from the ABH inquiry is that they were already investigated and no evidence was found that McCormack had any involvement with the activity in question. Defendants know this, or would know this had they done any sort of reasonable investigation into the very litigation proceedings that they were referencing, but instead chose to cherry-pick allegations from those proceedings to fit their intended narrative while ignoring the actual facts.

29.     Defendants further claimed that, due to the allegations concerning ABH, "McCormack's position at the company and past are a fact [sic] MiMedx would like to

keep to themselves." Defendants falsely stated that despite McCormack's "seniority," he is featured in no MiMedx materials, does not appear on MiMedx's website, and lacks a "regular format MiMedx email address." In actuality, however, McCormack does not have a senior position at MiMedx (he is a full five managerial levels below the CEO), but does have a "regular format MiMedx e-mail address" and publicly displays his MiMedx employment in prominent fashion on his LinkedIn profile. The simple reason he does not appear on MiMedx's website is that he is not a member of the executive management team. These facts were publicly available to Defendants via MiMedx's website and McCormack's LinkedIn profile, but were purposely ignored by Defendants. There is no basis for Defendants' knowingly false statement that MiMedx has attempted to conceal McCormack's employment with the Company.

30.    Defendants also falsely claimed that they found evidence to support the idea that MiMedx was engaged in fraudulent sales practices. For example, Defendants stated was that they uncovered an increase in MiMedx's Selling General & Administrative ("SG&A") expenses within the company's financial reports. According to Defendants, these expenses "are attributed to increases in sales staff, [but] do not correlate with specified increases in headcount and channel checked wages by a factor of two." Defendants also claimed that "[a]llegations made by [ABH] employees suggest that a substantial portion of SG&A growth is attributable to kickbacks and 'sales incentives' given to Department of Veterans Affairs ("VA") doctors and medical supply procurement officers." What Defendants suggest with these comments is that MiMedx's SG&A expenses evidence fraud because there is purportedly a discrepancy between the increase in SG&A and the increase in sales staff, and because allegations made against

ABH—not MiMedx—drew a link between increased SG&A and fraudulent practices. But MiMedx has publicly stated that it does not exclusively attribute SG&A to an increase in sales staff, and allegations concerning ABH's practices have nothing to do with MiMedx's practices. Defendants are unable to rebut these facts, which eradicate the entire premise of their false claim, but have purposely refused to withhold or retract it.

31.     Additionally, Defendants claimed that MiMedx misrepresented on an investor call that: "We've never had a distributorship owned by employees or family of employees. The only one we have is we have a former employee that is a distributor of ours now." Defendants therefore state that MiMedx lied to its investors, and that it did so to cover up its own self-dealing and facilitation of supposed kickback schemes. Again, however, the cited evidence does not support the claim. Defendants wrongly assert that a MiMedx subsidiary, Stability Biologics ("Stability") would count as a "distributorship owned by employees or family of employees" based on a statement in MiMedx's 10-K that when it acquired Stability, there was a "related party" (related to Stability, not MiMedx) controlled by a former Stability shareholder who later became a MiMedx employee. A plain reading of the 10-K excerpt reveals that it does not rebut or contradict MiMedx's statement in any way, which Viceroy knew but consciously ignored in order to continue sowing disinformation about the company.

32.     Defendants further stated that Stability was engaged in its own fraudulent sales practices while acting as an agent for a MiMedx competitor under federal investigation, suggesting—without basis—that the only reason MiMedx purchased Stability was to knowingly fold its competitor's fraud into its own. This assertion is false; MiMedx was not then aware and is not now aware that Stability has ever engaged

13

in any such practices, and if it was so aware, would never have purchased Stability. Indeed, it strains credulity for Defendants to assert that MiMedx would knowingly saddle itself with the liability presented by a company that was supposedly engaged in and was being investigated for fraudulent behavior.

33.    Defendants also reported, as fact, that MiMedx engaged in fraudulent sales practices based on the allegations in a now-resolved lawsuit filed by former employee Harold "Hal" Purdy.  As Defendants acknowledge, that lawsuit was settled.  However, in reporting the allegations of that lawsuit as fact, Defendants knowingly omit any mention that Purdy explicitly retracted his allegations against MiMedx in recognition of his own error (and even paid MiMedx a significant sum to settle the case).  This information is publicly-available in a company press release, but Defendants nevertheless published and refused to retract the statements made in reliance on the Purdy allegations.

34.    Later, Defendants falsely accused MiMedx of fraud by purporting to draw a link between MiMedx and the Forest Park Medical Center ("Forest Park") through one of MiMedx's former distributors, CPM Medical, LLC ("CPM").  Forest Park declared bankruptcy in late 2015 and saw several of its employees indicted in 2016.  MiMedx, however, did no direct business with Forest Park.  Its only connections were that: (i) CPM, an independent distributor, sold MiMedx products to Forest Park prior to MiMedx terminating the relationship for nonpayment in early 2015 (before the Forest Park bankruptcy and criminal proceedings); and (ii) two individuals indicted in the Forest Park incident owned FDA-registered facilities authorized to store MiMedx products. Therefore, contrary to Defendants' accusations, there is nothing to connect MiMedx to any fraudulent conduct at Forest Park.

14

35.     In other articles, Defendants "leaked" confidential emails of MiMedx sales personnel and VA physicians, misrepresenting their content and significance as some sort of "evidence" of malfeasance when in fact the emails did not prove any malfeasance at all.   For example, Defendants reported that one e-mail exchange showed a MiMedx employee "insisting" that a VA employee sign off on a consignment agreement, "contrary to VA hospital regulations at the time," which would supposedly make it easier for MiMedx to engage in fraud.   Contrary to Defendants' claim, however, there was no hospital policy or VA regulation prohibiting consignment agreements, and therefore nothing improper about MiMedx requesting—not "insisting"—that the hospital enter into such an agreement.

36.     Within the same set of "leaked" e-mails, Defendants claimed that an e-mail from a VA official exposed MiMedx's scheme of shipping product to VA facilities without a purchase order or even a consignment agreement.   Defendants know that shipping product without a purchase order or consignment agreement is not in and of itself illegal or fraudulent, and did not report any additional facts that would make a case for fraud.   In any event, the incident in question was no more than an instance of confusion by a new MiMedx employee, Robyn Scott (who, notably, no longer works for MiMedx) miscomprehending the procedure for that hospital and mistakenly sending a product shipment thinking that a consignment agreement was in place.   The shipment was properly returned to MiMedx.   As Defendants are, upon information and belief, in direct contact with Scott they knew this information before publishing.

*Statements Concerning MiMedx's Government Certifications and Unrelated Lawsuits*

37.     Another frequent, but false, theme of Defendants' articles was that MiMedx has intentionally falsified its representations to various government organizations.   For example, Defendants implied that MiMedx violated certain compliance requirements under the federal System for Award Management ("SAM") with respect to the hiring of former ABH employees, by stating it had "serious reservations as to whether MiMedx properly disclosed its employees' connections" with ABH.   This statement is entirely misleading because MiMedx has no duty to disclose under SAM or otherwise that it hired employees from another company, particularly those that were never indicted or convicted of any wrongful behavior.   There is, therefore, no basis to suggest that there was no "proper" disclosure.

38.     Defendants also stated that MiMedx's SAM compliance(s) were fraudulently certified by former employees of MiMedx who were not working at MiMedx and "had no authority" at the time of the certification, including Brent Miller and Don Ayers.   At the outset, Defendants' claim as to Miller is simply false, as Miller still consults for the company—whether or not his LinkedIn page states that he is "retired"—and had full authority.

39.     Moreover, there is a benign explanation for the purported discrepancies between the date(s) of signing and the date(s) of employment for both Ayers and Miller. The SAM certification is submitted through a company account, which had been set up prior to Ayers' departure from the company and Miller's move to a consulting role. Ayers was listed as the company representative on the account.   When he left the company in January 2017, his responsibilities were assumed by Kimberly Durgan.   In

March 2017, Durgan updated the account to replace Ayers' name with her own and published the March 27, 2017 certification with authorization from Miller (who was still a full-time employee of MiMedx).  However, Durgan had not updated the account in all necessary respects, and as a result, the March 27, 2017 certification erroneously still reflected Ayers' name.  In September 2017, Durgan realized she had not updated the representative name in all necessary respects on the company account, and fixed the error.  This effectively re-published all certifications dating back to at least 2013 with Durgan's name, including the March 27, 2017 certification, which was certified by Durgan and authorized by Miller at that time (when he was still a full-time employee of MiMedx).  While the actual facts concerning the idiosyncrasies of a federal computer system are far less fanciful than the convoluted "backdating" scheme that Defendants falsely invented, they are nevertheless true, and Defendants would have discovered them if it had conducted any sort of reasonable investigation before publishing.

40.     To the extent Defendants stated that McCormack is a MiMedx "principal" as defined by the Defense Federal Acquisition Regulation Supplement ("DFARS") or Federal Acquisition Regulation ("FAR"), and therefore that MiMedx was required to disclose in certification documents that he had been indicted or convicted of a crime, this statement is also false and misleading for two reasons.  First, as set forth above, McCormack was never even charged with a crime, let alone convicted of a crime.  Second, there is no basis to deem McCormack a "principal" at MiMedx.  Defendants' claimed support for this allegation is that under the DFARS and FAR definitions, a principal includes a company "director" and McCormack is MiMedx's "Director of New

Market Initiatives." This is, of course, no support at all, as Defendants know that despite McCormack's title he does not sit on the company's board of directors.

41.     And to the extent that Defendants purported to observe pricing irregularities between MiMedx and AvKARE, Inc's ("AvKARE") invoices—highlighting a supposed 1-cent difference in price between the products MiMedx sells directly and the MiMedx products sold through AvKARE—Defendants failed to note that the AvKARE prices accurately reflect, to the penny, the FSS Price without the Industrial Funding Fee ("IFF"). MiMedx specifically negotiates for FSS Pricing with IFF, which reflects pricing ending in ".00." Thus, there is no way to "bypass manual internal control checks at VA hospitals," as Defendants wildly speculated. Moreover, to the extent that Defendants attempted to dramatize this issue by claiming that "[d]irect business with the Veterans Affairs hospitals is estimated to be ~25% of MiMedx's revenue in 2016, and we anticipate the VA will take action against MiMedx on the back of evidence contained in this report," that statement was again false. MiMedx's direct business with the VA was less than 10% of its revenue in 2016.

42.     Apart from the certification issues, Defendants alleged that MiMedx "[f]ailed to formally announce to the market that they are a subject of an SEC investigation," and that "[i]f they have not filed an 8-K within 4 days of becoming aware of an SEC investigation, they are in breach of withholding material information from the investing public." However, MiMedx disclosed this information on September 21, 2017, well before the publication of the article in which these allegations were made. And contrary to Defendants' knowingly erroneous claim, there was no legal requirement that the disclosure take the form of an 8-K filing with the SEC.

43.     Finally, Defendants mentioned two unrelated lawsuits in an obvious ploy to discredit MiMedx and its CEO, without actually providing any basis to believe that there is any connection to MiMedx.  In fact, there is not.  The first of these lawsuits was not even filed against MiMedx, but against a subsidiary of Matria, the company formerly chaired by MiMedx's CEO.  MiMedx's CEO was not involved in the acquisition of that subsidiary, as he had stepped away from his role as CEO of Matria during that time period, and in any case the settlement did not prevent Matria from thereafter selling itself for over one billion dollars in total consideration (a welcome outcome for any investor). The second was a class-action lawsuit filed against MiMedx in 2013 and which was settled by MiMedx's insurers controlling the matter.  In either case, neither lawsuit has any bearing whatsoever on MiMedx's value as a company.  Defendants' attempt to imply otherwise was knowingly misleading.

*Statements Concerning Related and Physician-Owned Distributors*

44.     Another recurring theme throughout Defendants' articles is that MiMedx is either complicit or in a conspiracy with distributors—including supposed physician-owned distributors ("PODs")—to facilitate illegal kickbacks to physicians.  Defendants stated that MiMedx pays kickbacks to physicians by, among other things, "repackage[ing] or label[ing] larger, more expensive products as smaller packages" so that the unnamed PODs and other distributors "could substantially mark-up products without arousing suspicion from cash kickbacks from MiMedx."  These statements are simply false.

45.     For example, Defendants defamed a MiMedx employee named Donovan Schmidt by purporting to describe his "active involvement in the premediated formation

19

of a physician owned/related distributor with a prominent Atlanta physician." This is a false statement. Donovan was tangentially involved with a limited liability company formed by the wife of an Atlanta physician called Bio-Tech Enterprises, LLC ("Bio-Tech"). Bio-Tech is not a POD. However, Defendants claimed that a different entity called BioHealth Associates, LLC ("BioHealth") was formed on the same day by the Atlanta physician and his wife. Based on nothing but the timing of formation, Defendants drew and espoused the unsupported conclusion that Donovan "was selling and developing the sale of MiMedx products via Bio-Tech Enterprises, which in turn was selling or arranging commissions for Biohealth Associates LLC," implying an unlawful kickback scheme. These statements are untrue, as Donovan has performed no services for Bio-Tech, and has never been involved with BioHealth.

46.     Defendants also stated in one article that they obtained evidence showing that MiMedx claimed to do business with a POD called Stingray Medical in late 2016, even after the physician owner of that entity died in an automobile accident and the company was shut down. The problem is that Defendants identified the wrong company. MiMedx was not involved with the Stingray Medical in question, but an entirely different entity with a similar name. Notably, MiMedx pointed this blatant misrepresentation out to Defendants and Defendants refused to withdraw the claim, without any basis.

*Statements Concerning Medicare Fraud*

47.     Finally, Defendants have asserted that MiMedx engages in Medicare fraud in order to provide illegal kickbacks to physicians. The evidence that they cite does not support this false assertion.

48.     For example, Defendants stated that MiMedx and its distributors engaged in a scheme to manipulate the stock keeping unit ("SKU") number on their products to "to represent a more expensive product, [while] the lot numbers remain the same," and that bribed hospital nurses would enter the now-mismatched SKU and lot numbers into the hospital system. This, supposedly, would cause the "[h]ospitals [to be] charged for 4-5x times their real product purchase value," and for a correspondingly inflated reimbursement to be taken from Medicare. This claim is entirely fabricated and obviously false for at least two reasons, both of which Defendants knew at the time of their statements.

49.     First, Defendants' statement is nonsensical from the outset because MiMedx does not use "lot numbers," which are a manufacturing term for a single identifier describing a "lot" of product. Rather, MiMedx uses specific tissue ID numbers for each product and it would be impossible to manipulate these ID numbers to obtain higher reimbursement. This is because the 15-digit ID numbers are represented in multiple locations (the inner pouch, outer pouch, and the box), each time next to a bar code. The only way to change the numbers would be to over-label each of these with another label, which would be obvious, particularly since re-labeling the inner and outer pouches would require opening the product. Defendants have not shown, or even alleged, any such obvious conduct. In fact, Defendants have posted photos of MiMedx products showing that the products were not re-labeled at all. Second, in the hospital outpatient environment, Medicare reimburses in a bundled manner, meaning that whether a small piece or a larger more expensive piece of product is used, the facility is paid the

21

same flat bundled rate.  Therefore, there is not even an opportunity for the type of fraud that Defendants describe.

50.     Later, Defendants made the following statement of fact:

> Viceroy has obtained from a physician an email sent from MiMedx employees to physicians to fraudulently exploit the reimbursement system to financially benefit both the physician and MiMedx.  This is done through manipulation of Q-codes which denote the form of treatment in which a product was used.  The aim is for all treatments using MiMedx products to be coded as "wound care" in order to fraudulently maximize reimbursement. This type of Medicare fraud is referred to as 'up-coding'.

"Up-coding" is a practice in which the provider bills a health insurance payer using a CPT code for a higher level of service or procedure or a more complex diagnosis than is supported by medical necessity, and is indeed illegal.  However, Defendants stated that MiMedx employees presented physicians with an Explanation of Benefits ("EOB") as an "example" to show how to fraudulently up-code MiMedx products for a higher level than necessary to receive reimbursements, when the example they provided simply does not evidence up-coding in any way, shape or manner.

51.     Specifically, in the example EOB provided, Defendants claimed that the physician fraudulently coded his use of MiMedx's product EpiFix to obtain Medicare reimbursement.  Defendants support this specious claim by pointing in a footnote to a document prepared by a private health plan—not Medicare—called UnitedHealthcare, where the HCPCS code for the MiMedx product (Q4145) was not expressly matched to the CPT code specified by the physician (H20550). The obvious flaw with this argument, as Defendants were well aware, is that the EOB in question did not pertain to Medicare nor did it pertain to UnitedHealthcare.  As Defendants admitted, the EOB pertained to an entirely different private health plan, Blue Cross Blue Shield.  Blue Cross Blue Shield

does authorize reimbursement for the use of the MiMedx product under the CPT code specified by the physician. Thus, contrary to Defendants' unambiguous accusations ("[t]his miscoding is illegal"), there was simply nothing inappropriate about the coding used in the single example provided. Defendants knew that the evidence did not support their claim, but made it anyway solely in an attempt to malign MiMedx.

52.     On at least one occasion, Defendants stated that MiMedx was barred from doing business with certain physicians or hospitals because it had been providing unlawful "up-coding" advice, and circumvented these bars by doing business through a third party, which was also known to provide unlawful "up-coding" advice. This is false as MiMedx was not barred from doing business from anyone for "up-coding." MiMedx is not aware of any similar activity conducted by any entities with which MiMedx does business and expressly does not condone it.

53.     Defendants also stated that MiMedx created a new product specifically for the purpose of obtaining fraudulent Medicare reimbursements, without any support for such a claim. This product, according to Defendants, had "no clinical difference" from another MiMedx product other than the presence of a human "epithelial layer of cells" that permit prescribers to classify the product as a "skin graft substitute" which Medicare will reimburse. Defendants' suggestion is wrong because the presence or non-presence of a human epithelial layer has no bearing on whether prescribers can classify a product as a "skin graft substitute" or obtain Medicare reimbursement. In fact, many products are reimbursable whether they have a human epithelial layer or not, and some reimbursable products are even made of fish, cow or shark tissue. This information is publicly

available and easily accessible with a modicum of research.   Yet, Defendants were undeterred from making the false allegation.

54.   Later, Defendants published what they falsely described as "emails sent from MiMedx employees specifically instructing physicians on how to fraudulently increase Medicare reimbursement. . . . One problem: this advice was provided to surgical clients; whose products are ineligible for Medicare reimbursement."   What Defendants actually "leaked" was one email from a single MiMedx employee to another MiMedx employee—not to a physician—that was explicitly labeled "not for distribution."   The e-mail contained no fraudulent instructions to "surgical clients," nor are Defendants even correct that "surgical clients" are ineligible for Medicare reimbursement.   Many outpatient surgical procedures are eligible for Medicare reimbursement.   Moreover, to the extent that Defendants claimed that a certain MiMedx product was not eligible for Medicare reimbursement, this was also false, and was based upon Defendants' blatant misrepresentation of the product's "Q-code."   In actuality, the Q-code mentioned by Defendants quite obviously pertained to another company's product entirely.

55.   Lastly, Defendants purported to reveal "conclusive evidence that MiMedx EOB's are intended to exploit federal billing systems" by cobbling together a chart indicating that physicians make a profit when billing for the use of MiMedx products.   As Defendants know, it is not uncommon for physicians to receive a profit when billing for Medicare reimbursements; in fact, it is expected.   In January 2018, the government advised that it seeks to pay out 106% of the average sales price on Medicare-reimbursed products.   The additional 6% represents the amount that physicians will be compensated,

on average, for the products used and billed to Medicare. Thus, Defendants' suggestion was entirely false and misleading.

## Defendants' Defamatory Social Media Posts

*Posts from @ViceroyResearch*

56.     In addition to their defamatory articles, Defendants published false and misleading statements concerning MiMedx and McCormack on their publicly available Twitter page, located at https://twitter.com/viceroyresearch. Defendants used their Twitter page to direct traffic to their website, regurgitate the same claims against MiMedx and McCormack as stated in their articles, and to engage with the investing public, including other known short sellers. Defendants' tweets contain none of the same disclaimer language contained in some of their articles.

57.     On September 20, 2017, Defendants stated that: "MiMedx's 'New Market Initiatives Director' was instrumental in Advanced BioHealing's kickback & bribery inducement allegations $MDXG."[2] This false statement of fact references McCormack as the "instrumental" figure in the ABH "kickback & bribery inducement allegations." As noted previously, McCormack played no role in the alleged kickback scheme and was never charged or sued for any wrongful behavior, unlike other ABH employees.

58.     Also on September 20, 2017, Defendants stated that: "54 of $MDXG sales force and management previously employed in kickback & bribery inducement scheme: largest False Claims act settlement ever." Defendants are still referencing ABH, but as

---

[2]     "$MDXG" is the tag used on Twitter to refer to MiMedx by its stock symbol, and was frequently used by Defendants and their co-conspirators to organize and disseminate disinformation about the company.

noted previously, there were only four individuals at ABH found guilty of the scheme in question, none of whom were hired by MiMedx.

59.     On October 10, 2017, Defendants stated that:  "MiMedx / distributors change the SKU on labeling to represent a more expensive product. Hospitals were often charged for 4-5x $MDXG."  As noted previously, Defendants' allegations concerning the SKUs and lot numbers were false.

60.     On October 16, 2017, Defendants stated that: "MiMedx cannot change @SEC_Enforcement or regulatory action.  We have proven MiMedx supplied PODS contrary to @OIGatHHS advice. More to come!"  But as noted previously and as MiMedx has stated publicly, MiMedx has not directly supplied PODs in contravention of the advice of the Office of the Inspector General of the Department of Health and Human Services on PODs, and in fact has distanced itself from these types of entities.

61.     On October 31, 2017, Defendants stated that: "We evidence sales to deceased doctors, more PODs, and more fraud," and also that "Viceroy's latest report highlight $MDXG sales to another POD whose physician is no longer alive and the LLC deregistered."   Again, these references to Stingray Medical were erroneous because Defendants identified the wrong company.  MiMedx did not do business with the entity that Defendants identified.

62.     Between November 2, 2017 and November 9, 2017, Defendants made the following related statements:

> Remember the settlement between @MiMedx & Purdy? We've evidence $MDXG knew this statement to be false. @SEC_Enforcement incoming mail.

> Purdy needs to contact @SEC_Enforcement. We know you were forced to make false @MiMedx statements. $MDXG how's the deletes going? @AlderLaneeggs @AureliusValue.
>
> Petit, $MDXGs & Attorneys inc Haden violated Federal law . . .[3]

Contrary to these statements, Defendants did not in fact have any evidence that Purdy's statement retracting his allegations was false. All that Defendants had been provided was correspondence in a separate case, where MiMedx made a settlement demand to another former employee that incorporated as a term the withdrawal of allegations against the company. Again, there is nothing wrongful, coercive or illegal about this, and they certainly do not show that Purdy's retraction was false.

63.    On November 15, 2017, Defendants stated that: "Reading the @MiMedx court filings. $MDXG are not for the first time actively hiding information from their own investors." This tweet, in referencing "court filings" from an unrelated litigation to which MiMedx is a party, sought to cast doubt on MiMedx by pointing to the efforts of its opponent to violate the Federal Rules of Evidence and reveal inadmissible, privileged, and confidential matters. Defendants knew that MiMedx had simply sought to enforce compliance with the Federal Rules of Evidence in that case. Nevertheless, Defendants blatantly mischaracterized MiMedx's wholly-proper litigation conduct as "hiding information" from its investors.

64.    On November 16, 2017, Defendants stated that: "MiMedx employees Ricky Palmer and Alex Alpha send [sic] Explanation of Benefits soliciting the use of Q-codes in treatments using $MDXG products to be coded as 'wound care' in order to

---

[3]     "Petit" is a reference to MiMedx's CEO. "Haden" is a reference to MiMedx's General Counsel.

fraudulently maximize Medicare reimbursement." Similarly, on December 11, 2017, Defendants stated that: "Viceroy have obtained printouts of emails sent from MiMedx employees specifically instructing physicians on how to fraudulently increase Medicare reimbursement." As previously noted, however, the e-mail in question was circulated internally and labeled "not for distribution," and Defendants' characterization of the e-mail as instructions for "up-coding" was entirely inaccurate.

65.     On January 20, 2018, Defendants stated that: "Viceroy will this week report $MDXG Sunshine Act violations in detail. @AlderLaneeggs @AureliusValue." Defendants did not, in fact, report any such violations during the week in question. Nor could they, as MiMedx is not an "applicable manufacturer" under the Physician Payments Sunshine Act ("Sunshine Act"), pursuant to 42 U.S.C. § 1320a-7h. Thus, MiMedx cannot, by definition, violate any law under the Sunshine Act.

66.     On January 23, 2018, Defendants stated that: "Physicians have just sent us @MiMedx branded marketing docs 'selling' illegally on reimbursement spread. Didn't $MDXG make a statement that they have a policy against this? @AlderLaneeggs @AureliusValue $MDXG." This statement is false, as no "MiMedx branded marketing docs" concerning any illegal MiMedx Medicare policy exists. In fact, upon information and belief, Defendants were not provided anything at all.

*Posts from @AIMhonesty (Perring's Personal Account)*

67.     Prior to revealing his own identity, Perring operated an anonymous Twitter account under the name "Realistic Principles" and Twitter handle "@AIMhonesty," viewable at https://twitter.com/AIMhonesty. Perring continues to post under this account, although he is no longer anonymous. Perring defamed MiMedx from

this account in addition to the main @ViceroyResearch account. His tweets contain none of the same disclaimer language contained in some of Defendants' articles.

68.   On September 23, 2017, Perring stated that MiMedx was a "100% fraud. Check out @AureliusValue & @viceroyresearch nailed it. Looks like they're restricted from doing business with their main client." In this tweet, Perring referred to his own then-anonymous statements as Viceroy Research, and falsely claimed both that MiMedx was a "fraud" and "restricted from doing business with [its] main client." Neither of these statements was true, and specifically, MiMedx is not restricted from doing business with any of its clients.

69.   On October 13, 2017, Perring stated that "Wife owns LLC selling @MiMedx to Physician (husband) using $MDXG what could go wrong? Its [sic] a kickback that's what it is! @CGrantWSJ #redflag." With this tweet, Perring was apparently referring to Alpha Med Distributors, LLC and alleging that because one of that entity's owners was married to a physician, that necessarily meant MiMedx was paying kickbacks to the physician. Of course, as Perring knows, the mere relationship between a distributor's owner and a physician is no evidence of kickbacks or other wrongful activity. In any event, MiMedx did no direct business with Alpha Med.

70.   Given the foregoing, Plaintiffs allege that each of the Defendants conspired to adversely manipulate the stock price of MiMedx via false, defamatory, and/or misleading statements intended to manipulate traders into taking a negative view of MiMedx, lower the stock price, and rescue MiMedx's short sellers from the financial catastrophe that could have resulted if MiMedx's stock price continued to rise. Defendants' role was to act as a "shill" for bearish traders and short sellers of MiMedx

29

stock by publishing false and misleading information—while omitting true and positive information—in an attempt to manipulate and drive the stock price down even in the face of positive performance by the company.

### Defendants' Impersonation of MiMedx Personnel

71.     In addition to the defamatory articles and tweets posted by Defendants regarding MiMedx, Defendants took their disinformation campaign a step further when they began to impersonate MiMedx personnel in order to falsely promote the view that the company was engaged in fraud.

72.     Defendants first created a fake Twitter account in September 2017, at the same time that they prepared to launch their first attack against MiMedx (Defendants' first article was published on September 20, 2017).  The account was called "MDXG Whistleblower," used the handle "@mimdexwhistleb1," and used an unsophisticated typing and grammatical style in a clear attempt to prevent anyone from associating the user with any other Twitter accounts (such as Defendants' main disinformation front, @ViceroyResearch).   However, the @mimdexwhistleb1 account was registered on Twitter using a phone number that ended in the digits "27," the same as the @ViceroyResearch account.

73.     From the @mimdexwhistleb1 account, Defendants continued the disinformation campaign under the purported guise of a current MiMedx employee, claiming to be a "whistleblower" on company fraud.  The very first tweet from this account, dated October 2, 2017, re-published one of Defendants' tweets from the @ViceroyResearch account, calling it "v[ery] accurate."  Later, the account made such egregious and false statements as:

ex-coworkers threatened if they release info to @viceroyresearch & @AureliusValue. I sent my dear pete to VA its why theres an investigation

mm hope they will ignore shelf stuffing. lexi will lose law license. Remember the rape lexi? mdxg.[4]

as a current employee. mm are holding back information to avoid looking bad. they need to release a regulator announcement thats bad. lexi tell me about it.

74.    Upon information and belief, Defendants had used an extremely similar strategy previously in connection with their former short-selling operation called Zatarra Research, which is for all intents and purposes the predecessor to Viceroy Research, and was headed by Perring. (Zatarra was dissolved due to in-fighting between the partners of that operation shortly before Viceroy was formed and picked up where Zatarra left off). Indeed, when Perring and Zatarra initiated a short and distort campaign against a company called Wirecard, Perring used an account called "@whistleblowerwd' to disseminate a similar brand of disinformation.  From his personal account under the handle "@FollowValue1," Perring for a time followed the "@whistleblowerwd" Twitter account, but unfollowed it around the same time that the South African journalists discovered or began to discover his identity as one of the faces behind Viceroy Research.

75.    Defendants or their co-conspirators later created a fake e-mail account with Protonmail (an anonymous service that promotes itself as essentially subpoena-proof) called "currentemployee@protonmail.com." On or about October 10, 2017, that account e-mailed a number of recipients, including journalists, investors, and co-conspirators, including the purported "journalists" at The Capitol Forum.  The sender falsely claimed to be "an employee at MM (Mimedx) currently" and that they "have been

---

[4]    "Lexi" is a reference to MiMedx's General Counsel.

for some years." In a rambling, pages-long diatribe, the sender then went on to essentially make the very same false allegations that Defendants had included in their articles and tweets, apparently in an effort to substantiate those false allegations.

76.     After its creation, the "currentemployee@protonmail.com" e-mail address was registered as the account e-mail for the "@mimdexwhistleb1" Twitter account, evidencing that the same person or persons were behind both accounts. Further, both "currentemployee" and "@mimdexwhistleb1" used the same feigned grammatical style and both referred to MiMedx using the acronym "MM," which is not a commonly-used acronym for MiMedx.

77.     MiMedx has retained the undersigned attorneys to protect their rights and have incurred and are obligated to pay reasonable attorneys' fees.

78.     By virtue of Defendants' wrongful acts, MiMedx has also incurred other expenses and fees, for which Defendants are liable as special damages.

## FIRST CLAIM FOR RELIEF

### LIBEL

#### (By MiMedx Against All Defendants and Doe Defendants)

79.     MiMedx realleges and incorporates herein, by this reference, the allegations in paragraphs 1-78, herein.

80.     Defendants' statements identified herein, and each of them, constitute actionable defamation in that they represent false statements of fact, are defamatory by implication, or consist of opinions supported by undisclosed detrimental facts. Because those statements were written, they were libelous in nature.

81.     Defendants' statements were false and malicious, defamatory of MiMedx, published on the Internet, injured MiMedx's reputation and tended to expose MiMedx to negative views.   MiMedx has suffered actual and special damages as a result of Defendants' libelous statements, including the costs of protecting and rehabilitating its reputation in the community and the costs of counsel to defend against the unwarranted allegations leveled by Defendants.   Additionally, but for Defendants' wrongful conduct, MiMedx's company value would be higher.

82.     Defendants acted with intentional or reckless disregard for the truth or falsity of their statements about MiMedx, as described herein.

83.     For this alleged conduct, MiMedx seeks permanent injunctive relief against Defendants and damages in an amount to be proven at trial, plus punitive damages.

**SECOND CLAIM FOR RELIEF**

**VIOLATION OF FLORIDA DECEPTIVE & UNFAIR TRADE PRACTICES ACT**

**(By MiMedx Against All Defendants and Doe Defendants)**

84.     MiMedx realleges and incorporates herein, by this reference, the allegations in paragraphs 1-78, herein.

85.     Defendants' conduct herein constituted "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of . . . trade or commerce" as defined in the FDUTPA, Section 501.201, Florida Statutes, *et seq.* Defendants' acts offended established public policy against the dissemination of false, misleading and defamatory statements, and at the same time were immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, including

MiMedx's customers, who have been dissuaded from doing business with the company due to Defendants' spurious and public allegations.

86.     As a direct and proximate result of Defendants' conduct herein, MiMedx's corporate valuation has been artificially manipulated to a level far below what it otherwise would have been but for Defendants' conduct.

87.     For this alleged conduct, MiMedx seeks an award of actual damages and permanent injunctive relief against Defendants.   MiMedx also seeks to recover its reasonable attorneys' fees and costs incurred herein.

## JURY DEMAND

88.     MiMedx requests a trial by jury on all matters as to which it is entitled by law.

## PRAYER FOR RELIEF

WHEREFORE, MiMedx respectfully requests the following relief:

A.     That Defendants, and all of their respective officers, agents, servants, representatives, employees, attorneys, parent and subsidiary corporations, assigns and successors in interest, and all other persons acting in concert with Defendants, be permanently enjoined from making any further false or misleading statements concerning MiMedx and from making statements that constitute unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as toward MiMedx and its consumers.

B.     That Defendants, and all of their respective officers, agents, servants, representatives, employees, attorneys, parent and subsidiary corporations, assigns and successors in interest, and all other persons acting in concert with Defendants, be

permanently enjoined from any other wrongful, defamatory, or misleading conduct discovered during the course of this action;

C.     That MiMedx be awarded damages, including special and punitive damages, for Defendants' wrongful conduct in an amount according to proof at trial;

D.     That MiMedx be awarded its reasonable attorneys' fees and costs; and

E.     That MiMedx be granted such further relief as the Court may deem just and equitable.

By: /s/ Christopher C. Hazelip

**ROGERS TOWERS, P.A.**

Christopher C. Hazelip
Florida Bar No. 438049
Samuel J. Horovitz
Florida Bar No. 059015
1301 Riverplace Blvd., Suite 1500
Jacksonville, Florida  32207
(904) 398-3911 (telephone)
(904) 396-0663 (facsimile)
chazelip@rtlaw.com (email)
shorovitz@rtlaw.com (email)

**WARGO & FRENCH LLP**

Joseph D. Wargo
Florida Bar No. 934194
David M. Pernini
Georgia Bar No. 572399
(*Pro Hac Vice* to be filed)
999 Peachtree St. NE, 26th Floor
Atlanta, GA  30309
(404) 853-1500 (telephone)
(404) 854-1501 (facsimile)
jwargo@wargofrench.com (email)
dpernini@wargofrench.com (email