# EXHIBIT "4"

# MiMedx's employment of kickback & bribery scheme inducers makes it uninvestable

**Viceroy Research uncovered substantial <u>previously-unreported</u> data evidencing an incestuous hiring policy from a <u>kickback & bribery scheme</u>, a possible <u>SEC enforcement investigation</u>, and indications of <u>channel stuffing</u>.**

MiMedx (NASDAQ:**MDXG**) is a manufacturer and sales organization primarily engaged in the sale of allografts. While the outward picture is one of a strong central business and sales organization the truth is far from it.

- **Sean McCormack[1] - MiMedx's "New Market Initiatives Director" – was an instrumental figure in Advanced BioHealing's kickback and bribery inducement scheme[2]**, which resulted in the **largest settlement of a False Claims Act breach to date: $350m settlement[3]**, and a $600m+ write-down by Shire. At least 54 Advanced BioHealing alumnus have been identified by Viceroy within MiMedx's sales force including at least 15 in senior employment positions.

- **Viceroy has discovered that SAM.gov (System for Award Management) compliance requires disclosures relating to bribery and other criminal activities or conduct by certificate holders.** Viceroy has serious reservations as to whether **MiMedx properly disclosed its employees' connections with the Advanced BioHealing/Shire kickback and bribery inducement scheme.**

- MiMedx's SAM compliance certification was filled out by Don Ayers[4], who was **no longer employed by MiMedx at the time the forms were signed**.

- A FOIA request was withheld by the Securities and Exchange Commission (SEC) **suggesting MiMedx is the target of an undisclosed SEC enforcement investigation.**

- Former employees-turned **whistleblowers accused MiMedx of aggressive channel-stuffing practices and improper revenue recognition policies**. Their statement named many ex-Advanced BioHealing employees. Despite the fact these allegations having been withdrawn, Viceroy's analysis found evidence supporting these claims in MiMedx's financial accounts - there's no smoke without fire.

- Viceroy finds the MiMedx-AvKare supplier-distributor relationship extremely suspicious. A 2014 AvKare invoice contained a MiMedx fax number and was signed by a MiMedx employee. **MiMedx did not have certification to sell to government agencies at the time**.

- **MiMedx's pricing policy suggests an attempt to conceal or draw attention away from purchase orders[5]**, specifically a 1 cent difference between AvKare and MiMedx pricing. Viceroy is planning to consult with the Department of Veterans Affairs on this policy.

- **Viceroy's analysis of MiMedx's acquisition and divestment of Stability Biologics demonstrates the pinnacle of managerial incompetency and financial illiteracy.**

> *Viceroy's comprehensive investigation into MiMedx has revealed an organization with serious issues in senior management, acquisitions, operations, and accounts which we believe makes the company uninvestable.*

In light of the evidence we have gathered, Viceroy believes MiMedx is at serious risk of losing government supply certifications and the sales privileges therein which comprise a substantial portion of revenues.

**If allegations are true, Viceroy believes MiMedx is valued at $0.**

---

[1] https://www.linkedin.com/in/seanmccormack904/
[2] Advanced BioHealing Case Complaint 8-11-cv-00176-JSM-MAP
[3] https://www.justice.gov/opa/pr/shire-plc-subsidiaries-pay-350-million-settle-false-claims-act-allegations
[4] https://www.linkedin.com/in/don-ayers-a3a942a/
[5] https://www.va.gov/nac/Search/Details/V797P-4076b

Viceroy Research Group                                                                 www.viceroyresearch.org

## Important Disclaimer – Please read before continuing

This report has been prepared for educational purposes only and expresses our opinions. This report and any statements made in connection with it are the authors' opinions, which have been based upon publicly available facts, field research, information, and analysis through our due diligence process, and are not statements of fact. All expressions of opinion are subject to change without notice, and we do not undertake to update or supplement any reports or any of the information, analysis and opinion contained in them. We believe that the publication of our opinions about public companies that we research is in the public interest. We are entitled to our opinions and to the right to express such opinions in a public forum. You can access any information or evidence cited in this report or that we relied on to write this report from information in the public domain.

To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the stock covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer. We have a good-faith belief in everything we write; however, all such information is presented "as is," without warranty of any kind – whether express or implied.

In no event will we be liable for any direct or indirect trading losses caused by any information available on this report. Think critically about our opinions and do your own research and analysis before making any investment decisions. We are not registered as an investment advisor in any jurisdiction. By downloading, reading or otherwise using this report, you agree to do your own research and due diligence before making any investment decision with respect to securities discussed herein, and by doing so, you represent to us that you have sufficient investment sophistication to critically assess the information, analysis and opinions in this report. You should seek the advice of a security professional regarding your stock transactions.

This document or any information herein should not be interpreted as an offer, a solicitation of an offer, invitation, marketing of services or products, advertisement, inducement, or representation of any kind, nor as investment advice or a recommendation to buy or sell any investment products or to make any type of investment, or as an opinion on the merits or otherwise of any particular investment or investment strategy.

Any examples or interpretations of investments and investment strategies or trade ideas are intended for illustrative and educational purposes only and are not indicative of the historical or future performance or the chances of success of any particular investment and/or strategy.

As of the publication date of this report, you should assume that the authors have a direct or indirect interest/position in all stocks (and/or options, swaps, and other derivative securities related to the stock) and bonds covered herein, and therefore stand to realize monetary gains in the event that the price of either declines.

The authors may continue transacting directly and/or indirectly in the securities of issuers covered on this report for an indefinite period and may be long, short, or neutral at any time hereafter regardless of their initial recommendation.

## Contents

Summary ............................................................................................................................................. 3

1.    Sean McCormack: the $350 million-dollar man ............................................................................. 5

2.    Don Ayers and the FARS & DFARS report ................................................................................... 12

3.    Advanced BioHealing Employee headcount ................................................................................. 15

4.    SEC undisclosed investigation ..................................................................................................... 18

5.    Channel-stuffing allegations and AvKare ..................................................................................... 22

6.    Related party channel stuffing allegations .................................................................................. 25

7.    Stability Biologics ......................................................................................................................... 29

8.    Internal controls & change of auditors ........................................................................................ 32

9.    Tornquist and the contract .......................................................................................................... 33

10.      Conclusion ................................................................................................................................. 35

## Summary

MiMedx is a manufacturer and sales organization primarily engaged in the sale of allografts.

MiMedx has systematically recruited sales staff from now-defunct Advanced BioHealing, a former subsidiary of Shire Pharmaceuticals. Advanced BioHealing operated a kickback and bribery sales inducement scheme which resulted in the largest settlement of a False Claims Act to date of $350m, and a $600m write down by Shire when it was later sold.

*MiMedx whistleblowers have made allegations over the last few years suggesting MiMedx's sales scheme is not dissimilar to that of Advanced BioHealing.*

At least 54 Advanced BioHealing alumnus have been identified by Viceroy within MiMedx's sales force, including at least 15 in senior employment positions. None of these employees, despite their seniority, appear on public MiMedx documents.

Perhaps the most concerning hire Viceroy identified was Sean McCormack – MiMedx's "New Market Initiatives Director" – who has been named in Advanced BioHealing court documents as an instrumental figure in the kickback and bribery inducement scheme, including as one of the sales staff trainers.

Prior to his tenure at Advanced BioHealing, McCormack was a Regional Sales Manager at Biolase. Biolase was also accused of channel-stuffing during McCormack's tenure – setting a general theme which we believe MiMedx has not broken away from.

A number of former employees-turned **whistleblowers have accused MiMedx of aggressive channel-stuffing practices and improper revenue recognition policies**. Their statement named many ex-Advanced BioHealing employees. Despite the fact these allegations having been withdrawn, Viceroy's analysis found evidence supporting these claims in MiMedx's financial accounts.

Growth in Selling General & Administrative (SG&A) expenses, which are attributed to increases in sales staff, do not correlate with specified increases in headcount and channel checked wages by a factor of two. Allegations made by Advanced BioHealing employees suggest that a substantial portion of SG&A growth is attributable to kickbacks and 'sales incentives' given to VA doctors and medical supply procurement officers.

MiMedx is dependent on System for Award Management (SAM) certification in order to be able to sell to government agencies including VA hospitals. SAM compliance requires disclosures relating to bribery and other criminal activities or conduct by certificate holders.

*Viceroy have serious reservations as to whether MiMedx should have disclosed its employees' connections with the Advanced BioHealing/Shire kickback and bribery inducement scheme.*

MiMedx's SAM compliance certification was filled out by Don Ayers[6], who was no longer employed by MiMedx at the time the forms were signed. Don Ayers signed the form with confirmation that the company or its principals (which in definition includes managerial / supervisory roles) have not been involved in federal violations, such as a kickback and bribery scheme.

---

[6] https://www.linkedin.com/in/don-ayers-a3a942a/

3

*We believe MiMedx shareholders should immediately demand an independent investigation into MiMedx's hiring practices and SAM compliance. Viceroy believes MiMedx are at serious risk of losing their SAM certification.*

Viceroy and our associates submitted FOIA requests to a number of government departments during the course of our due diligence process.

*A FOIA request made by Viceroy regarding MiMedx was withheld under 5 U.S. Code § 552 (b)(7)(A); legislation suggests MiMedx is the subject of SEC investigation and enforcement process.*

Viceroy find the MiMedx-AvKare supplier-distributor relationship extremely suspicious. A 2014 AvKare invoice obtained by Viceroy contained a MiMedx fax number and was signed by a MiMedx employee, suggesting MiMedx was procuring and soliciting sales on behalf of its distributor. **MiMedx did not have certification to sell to government agencies at the time.**

**MiMedx's pricing policy suggests an attempt to conceal or draw attention away from purchase orders**[7], specifically a 1 cent difference between AvKare and MiMedx pricing. Viceroy believe this pricing difference is a method to bypass manual internal control checks at VA hospitals. Viceroy is planning to consult with the Department of Veterans Affairs on this.

Stability Biologics, which was acquired by MiMedx is a human tissue products provider to the healthcare industry closely aligned with MiMedx's business model. Ironically, it appears that Stability biologics was itself channel-stuffing, as a $10m payment for the Stability biologics business drew a $3.4m offset due to returned and/or expired stock.

MiMedx sold Stability back to its founder for only $3.5m in promissory notes and offsets against all earn-out fees (which Viceroy assumes were massive), for which MiMedx would indemnify Stability's stockholders of allegations of material misrepresentations.

*The Stability Biologics deal represents the pinnacle of managerial incompetency and financial illiteracy. Viceroy believes red flags such as this make MiMedx uninvestable.*

An auditor discovery of a material internal control weaknesses at the end of 2016 adds to MiMedx's track record of poor due diligence. More than six months later, **the material weakness had yet to be corrected and MiMedx subsequently replaced their long-standing auditors**.

**Given the seriousness nature of allegations and systematic reports of federal violations,** MiMedx are at serious risk of losing their ability to sell to government agencies on the back of significant compliance misrepresentations. We believe MiMedx is uninvestable and entirely unethical in its business practices. Direct business with Veterans Affairs is estimated by brokers to be ~25% of MiMedx's revenue in 2016, and we anticipate the VA will take action against MiMedx in light of the facts in this report

**Viceroy have submitted a whistleblower dossier with the SEC** and will continue to make numerous enquiries relating to MiMedx to Veterans Affairs and other government authorities on the back of this research.

---

[7] https://www.va.gov/nac/Search/Details/V797P-4076b

Viceroy Research Group                                    www.viceroyresearch.org

### 1.   Sean McCormack: the $350 million-dollar man

Sean McCormack is **Director of New Market Initiatives at MiMedx**. Previously, McCormack was the National Sales Director at Advanced BioHealing[8] - one of many former Advanced BioHealing employees alleged to have made false or fraudulent claims for its Dermagraft™ product and related services to Medicare, Medicaid and TRICARE programs from at least July 2008 to January 2011.



*Figure 1 Extract of Sean McCormack's LinkedIn profile[9]*

Given McCormack's history, Viceroy believes it is highly irresponsible of MiMedx to employ Sean McCormack, let alone in a position of power and influence.

## The Advanced BioHealing scheme

McCormack's LinkedIn profile shows his employment at Advanced BioHealing (under the name Shire Regenerative Medicine) began in 2007.

McCormack and Advanced BioHealing's management were accused of directing "...a pervasive scheme to provide numerous types of illegal remuneration to physicians and their office staff..."

> 17.   Advanced Biohealing management directs a pervasive scheme to provide numerous types of illegal remuneration to physicians and their office staff in return for (1) those physicians purchasing Dermagraft to use on Medicare patients in the treatment of diabetic foot ulcers. and (2) physician office staff providing Advanced Biohealing with patients' protected health information so that Advanced Biohealing can perform insurance verifications to determine how much Medicare would pay for Dermagraft on specific patients.

*Figure 2 Advanced BioHealing Case Complaint 8-11-cv-00176-JSM-MAPs*

*Evidence was such that Advanced BioHealing's parent company Shire Pharmaceuticals LLC settled the largest False Claims Act recovery case ever for $350 million dollars.*

---

[8] Advanced BioHealing Case Complaint 8-11-cv-00176-JSM-MAP
[9] https://www.linkedin.com/in/seanmccormack904/

## Shire PLC Subsidiaries to Pay $350 Million to Settle False Claims Act Allegations

The Justice Department announced today that Shire Pharmaceuticals LLC and other subsidiaries of Shire plc (Shire) will pay $350 million to settle federal and state False Claims Act allegations that Shire and the company it acquired in 2011, Advanced BioHealing (ABH), employed kickbacks and other unlawful methods to induce clinics and physicians to use or overuse its product "Dermagraft," a bioengineered human skin substitute approved by the FDA for the treatment of diabetic foot ulcers. Shire plc is a multinational pharmaceutical firm headquartered in Ireland, with its United States operational headquarters in Lexington, Massachusetts. Shire sold the assets associated with Dermagraft in early 2014.

"This settlement represents the largest False Claims Act recovery by the United States in a kickback case involving a medical device," said Principal Deputy Assistant Attorney General Benjamin C. Mizer, head of the Justice Department's Civil Division. "Kickbacks by suppliers of healthcare goods and services cast a pall over the integrity of our health care system. Patients deserve the unfettered, independent judgment of their health care professionals."

*Figure 3 Shire PLC Subsidiaries to Pay $350 Million to Settle False Claims Act Allegations* [10]

After investigating Advanced BioHealing and the claims of former employees, Sean McCormack's involvement stood out as a key influence to the kickback and bribery scheme. He was specifically named as directing the illegal inducements to improve sales usually through bribery and kickbacks per Figure 4 below:

19.    Many of these inducements were directed by National Sales Director Sean McCormack. Others were directed by Regional Manager Pete Goodwyn.

*Figure 4 Advanced BioHealing Case Complaint 8-11-cv-00176-JSM-MAP* [11]

The charges against Advanced BioHealing were numerous: **inducements provided by Advanced BioHealing to physicians included** [12]:

18.    These various types of inducements provided by Advanced BioHealing to physicians include:

    A.    Providing free medical supplies to physicians;

    B.    Providing tickets to sports games and Cirque de Soleil performances to physicians;

    C.    Providing free weekends at expensive resort locations to physicians;

    D.    Providing free scrubs to physicians;

    E.    Providing cameras to physicians to use to take photos of patient wounds for use in case studies for which physicians could be paid by Advanced BioHealing;

    F.    Providing free mailers and postage to promote physician practices;

    G.    Providing liquor to physicians and their office staff;

    H.    Providing edible fruit arrangements to physicians and their office staff;

    I.    Providing gas cards to physicians and their office staff;

    J.    Providing Starbucks, Bonefish Grill, Applebees, 7-11 and other restaurant gift cards to physicians and their office staff;

    K.    Providing American Express, Visa and Blockbuster gift cards to physic ans and their office staff;

    L.    Providing physicians with free insurance verification forms indicating the reimbursement available to physicians for application of Dermagraft to specific patients to encourage and motivate physicians to apply Dermagraft;

*Figure 5 Advanced BioHealing Case Complaint 8-11-cv-00176-JSM-MAP – pt. 1*

---

[10] https://www.justice.gov/opa/pr/shire-plc-subsidiaries-pay-350-million-settle-false-claims-act-allegations
[11] Advanced BioHealing Case Complaint 8-11-cv-00176-JSM-MAP Available on PACER
[12] See footnote 10

M.   Providing a guarantee to physicians that they will not have to pay Advanced Biohealing for the full price of Dermagraft purchased if a patient's insurer does not reimburse the physician at the amount predicted by Advanced Biohealing;

N.   Providing physicians "scrap credits" or rebates for unused pieces of Dermagraft;

O.   Providing physicians with ghost-written letters of medical necessity;

P.   Providing physicians with draft dictation language and progress notes to be included in patient charts to justify using Dermagraft;

Q.   Providing physicians with free business development kits; and

R.   Providing physicians with free "case studies" which physicians use in marketing to referring physicians, home health agencies and assisted living facilities.

*Figure 6 Advanced BioHealing Case Complaint 8-11-cv-00176-JSM-MAP – pt. 2*

*As a reminder to investors the False Claims Act complaint states: **many of these inducements were directed by National Sales Director Seam McCormack**. Others were directed by Regional Manager Pete Goodwyn[13].*

One Advanced BioHealing executive, Todd Clawson, was later convicted for bribery of government officials and working together with co-conspirators to create algorithms to direct VA podiatrists and clinicians to use Dermagraft™ to boost sales[14].

Sean McCormack stood accused of behavior that resulted in a $350m settlement and a $650m write-off for Shire Pharmaceuticals. While the case was settled and implies no admission of guilt we question why MiMedx has not disclosed his employment to investors.

Perhaps most concerning is that Sean McCormack appears to have been responsible for training sales staff committing these offenses:

ABH's Remuneration-Based "Marketing" Program

56.   Harvey worked for ABH for just over one year. During that time, he witnessed rampant use of remuneration by ABH sales representatives.

57.   Upon joining the Company, he attended a training conducted by Keith O'Briant, Tony Ezell, and Sean McCormack.

58.   At that time, O'Briant was the Vice President of Sales; now, he is ABH's Senior Vice President of North American Sales.

59.   Ezell is the Western Regional Sales Director and McCormack is the Eastern Regional Sales Director.

*Figure 7 Extract from Case 1:11-cv-00898-KBJ – COMPLAINT - Plaintiff/Relater Mark J. Harvey*

Despite his alleged role in the scheme, McCormack's LinkedIn seems to boast about his skills as a manager, executive and salesperson at Advanced BioHealing.

---

[13] Advanced BioHealing Case Complaint 8-11-cv-00176-JSM-MAP Available on PACER
[14] http://www.fiercebiotech.com/medical-devices/ex-med-tech-ceo-faces-jail-time-for-bribing-docs-to-promote-skinlike-wound-dressing

Viceroy Research Group                                                                    www.viceroyresearch.org

> • Changed standard of care, driving dramatic sales increases leading to acquisition. Recognized that the standard of care for the treatment of diabetic foot ulcers had not changed since 1999. Undertook extensive literature review, crafted message about how the standard of care had changed. Incorporated supporting literature with the assistance of key opinion leaders into a sales and marketing campaign entitled "Dr:ving the Standard of Care." Brought a group of global thought leaders and experts together to publish "The Consensus Recommendations on Advancing the Standard of Care for Treating Neuropathic Foot Ulcers in Patients with Diabetes" which ABH's technology was positioned as part of the new standard of care. Increased sales from $44M to $200M leading to ABH's acquisition for $750M by Shire.
>
> • Penetrated key referral markets. Focused on home health and dialysis markets to create an extensive referral network where more patients would be exposed to ABH's advanced technology. Chose five high priority geographies to pilot new business model. Hired five seasoned business development specialists. Created partnerships with 22 advanced wound care treatment centers. Increased product revenue by 156%.

*Figure 8 Extract of Sean McCormack's LinkedIn profile[15]*

**McCormack's claims seem somewhat flat given that these activities led to massive losses by both Advanced BioHealing and Shire Pharmaceuticals**. He claims to have increased sales and product revenue, going so far as to say that these actions "[led] to ABH's acquisition for $750M by Shire." In addition to his, he "penetrated key referral markets...created partnerships".

He **fails to mention that Advanced BioHealing settled $350m for a False Claims Act violation caused by a scheme he is alleged to have directed**. He fails to mention that Shire took a +$600m write down on their purchase. He fails to mention that his attempts at "[penetrating] key referral markets" allegedly included bribery and kickbacks. He fails to mention that Advanced BioHealing allegedly "[created] partnerships with...advanced wound care centers" with gifts, inducements and enormous speaking fees.

In light of this, we feel that McCormack's boasts may be a little selective in their disclosure.

[15] https://www.linkedin.com/in/seanmccormack904/

8

## McCormack joins MiMedx

Despite being named as a key influencer of Advanced BioHealing's kickback and bribery scheme which resulted in the largest False Claims Act Settlement, **Sean McCormack is now Director of New Market Initiatives at MiMedx**[16]:

**Director, New Market Initiatives**

MiMedx

Jul 2016 – Present  •  1 yr 3 mos

Marietta, Georgia

Support the growth of new expanded market opportunities in wound care. Responsible for creating and implementing marketing campaigns and programs using a variety of tools and communication methods to drive sales growth and enhance product adoption in new emerging markets

*Figure 9 Sean McCormack LinkedIn – September 15, 2017[17]*

*Despite McCormack's seniority he appears in NO MiMedx materials or websites and does not appear to have a regular format MiMedx email address.*

We believe McCormack's position at the company and past are a fact MiMedx would like to keep to themselves. Do not take our word for it, try Google™: http://lmgtfy.com/?q=Sean+McCormack+joins+Mimedx

## High Sales, General and Administration costs

In light of the above, we find it concerning that MiMedx's largest cost by far is its Selling, General and Administrative (SG&A) expenses which consists of:

including government affairs and other support areas as well as the addition of Stability Biologics personnel and associated costs. Selling, General and Administrative expenses consist of personnel costs, professional fees, sales commissions, sales training costs, industry trade show fees and expenses, product promotions and product literature costs, facilities costs and other sales, marketing and administrative costs, depreciation and amortization, and share-based compensation. Share-based compensation included in Selling, General and

*Figure 10 SG&A components[18]*

Figure 11 below shows SG&A expenses as a percentage of sales for MiMedx and Integra Lifesciences.



*Figure 11 Selling, General & Administrative as a % of Net Sales*

---

[16] https://www.linkedin.com/in/seanmccormack904/
[17] See footnote 15
[18] FY 2016 financial statements – pg. 42

MiMedx's SG&A expenses as a percentage of Sales is consistently around 20 percentage points above competitors.

Last financial year MiMedx saw a $46.6m (35%) increase in SG&A expenses to $180m. MiMedx attributes the majority of these costs to the addition of personnel. MiMedx increased its headcount by 140 individuals through 2016[19].

volume. General and administrative expense increases were driven primarily by costs associated with adding personnel to support continued growth including government affairs and other support areas as well as the addition of Stability Biologics personnel and associated costs. Selling, General and

*Figure 12 SG&A costs per employee[20]*

This suggests that after share-based compensation, amortization, acquisition costs, rent costs and one-time acquisition costs, MiMedx spent **$306,928** per new staff member on wages. Glassdoor data on MiMedx shows Sales Executives (who are on the higher end of the income range) were paid **$147,000-$162,000** including bonuses.

| Breakdown of SG&A increase 2015-2016[21] | ($) |
|---|---|
| **Increase in SG&A expenses YoY** | **46.60m** |
| Less: Increase in share based compensation | 0.90m |
| Less: Increase in amortization | 1.20m |
| Less: One-time acquisition related costs | 1.08m |
| Less: Increase in rent | 0.45m |
| **Net Increase presumably attributable to new staff** | **42.97m** |
| Increase in headcount | 140 |
| **SG&A expense per new employee** | $306,928 |

*Figure 13 SG&A costs per employee*

Even if we assume this high-end income across all MiMedx's new hires, we question where the remaining ~$145,000 per new staff member went.

---

[19] FY 2016 financial statements – pg. 16 & FY 2015 financial statements – pg. 15
[20] FY 2016 financial statements – pg. 42
[21] FY 2016 financial statements – pg. 41, 42 & 74

Viceroy Research Group                                                                 www.viceroyresearch.org

Perhaps coincidentally, Sean McCormack and other Advanced BioHealing sales management staff's role at Advanced BioHealing allegedly included directing employees to spend excessive amounts on gifts, holidays and novelty items on clients. We cannot envision a satisfactory alternative (including marketing costs, for example) which would explain such a large discrepancy:

> 72.   Assuming that each sales representative followed O'Briant's instructions and, like Harvey, spent between $4,500 and $7,000 per month on gifts and other remuneration, between $189,000 and $294,000 was given to VA employees by ABH during that time period.
>
> 73.   From approximately July of 2009 until November of 2009, the number of ABH sales representative increased to 11.  Applying the assumptions discussed above, between $198,000 and $308,000 was given to VA employees by ABH during those four months.

*Figure 14 Extract from Case 1:11-cv-00898-KBJ – COMPLAINT - Plaintiff/Relater Mark J. Harvey, for his complaint against Defendant Advanced BioHealing, Inc.,[22]*

*This financial analysis increases conviction in Viceroy's belief that MiMedx is using extreme, unsustainable, and unethical practices to boost its sales numbers.*

## Key takeaways

**Our findings on Sean McCormack alone show a historic pattern of behavior that has proven costly to the businesses he has been employed in, both in monetary terms and public perception.** We believe the VA will not look upon McCormack's involvement with MiMedx favorably, and that action will be taken against them. Given the sizable share of MiMedx's revenue comes from the VA, we believe this mistake will cost them dearly.

*Why is a man accused of **directing** illegal inducements by the Department of Justice which led to the largest false claims settlement **currently Director of New Market Initiatives at MiMedx?** Are investors not in the slightest concerned? Or are they unaware?*

---

[22] Case 1:11-cv-00898-KBJ – COMPLAINT - Plaintiff/Relater Mark J. Harvey, for his complaint against Defendant Advanced BioHealing, Inc.,

Viceroy Research Group                                                            www.viceroyresearch.org

### 2.    Don Ayers and the FARS & DFARS report

Don Ayers was MiMedx's former National Director of Strategic Accounts, a role which he began in February 2013. **Since leaving MiMedx in January 2017,** Ayers is now the Vice President of Market Access at Next Science a company primarily concerned with the research and manufacture of bacterial biofilm solutions[23] which he disclosed started in March 2017. Note his previous roles at Advanced BioHealing and Shire:



*Figure 15 Don Ayers LinkedIn – September 15, 2017[24]*

#### "Ghost" signatures and simultaneous employment with Next Science

For context, a Federal Acquisition Regulation & Defense Federal Acquisition Regulation (FAR & DFARS) form is an annual requirement for contractors containing information pertinent to their contracts with the US government.

---

[23] https://www.nextscience.com/about-next-science/
[24] https://www.linkedin.com/in/don-ayers-a3a942a/

Viceroy Research Group                                                                                      www.viceroyresearch.org

**Given Ayers' January 2017 departure from MiMedx how did Ayers e-sign a FAR & DFARS certification report** on MiMedx's behalf on dated March 27th, 2017?



**FAR & DFARS Report**

Certification for: MiMedx Group, Inc.
DUNS: 876485496
Certification Validity From:Mon Mar 27 12:13:59 EDT 2017
To :Tue Mar 27 12:13:59 EDT 2018

*Donald Ayers had left MiMedx according to his LinkedIn in January 2017 - how is he still there?*

I have read each of the FAR and DFARS provisions presented below. By submitting this certification, I, Donald Ayers, am attesting to the accuracy of the representations and certifications contained herein, including the entire NAICS table. I understand that I may be subject to penalties if I misrepresent MiMedx Group, Inc. in any of the below representations or certifications to the Government.

*Figure 16 MiMedx FAR & DFARS Report signed by Don Ayers*

If Ayers was indeed not employed at MiMedx during this time then we question Ayers' assertion of the accuracy of the contents of the certification report[25].

## Simultaneous employment at Next Science while employed at MiMedx

Even stranger is that Ayers is listed as the Vice President of Market Access at Next Science in Next Science releases dating as far back as 2015, almost 2 years before he left MiMedx, **while simultaneously being employed at MiMedx[26]**.



Inquiries:
**Don Ayers**
Vice President, Market Access
855-564-2762
sales@nextscience.com

*Figure 17 Don Ayers' contact details on Next Science press release dated 9/1/15[27]*

This is clearly a gross violation of the non-compete agreement MiMedx has so aggressively enforced against three employees involved in the whistleblower case against them.

As evidenced in the sections 5 and 6 of our report Viceroy believes that MiMedx's non-compete is being used selectively as a weapon to punish employees that refuse to get with the program.

## Possible misrepresentations of Federal violations

In the same FAR DFARS certification report, Ayers asserts the following on behalf of MiMedx:



the award of contracts by any Federal agency;
    (B) Have [ ] Have not [X] , within a three-year period preceding this offer, been convicted of or had a civil judgment rendered against them for: commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State, or local) contract or subcontract; violation of Federal or State antitrust statutes relating to the submission of offers; or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, violating Federal criminal tax laws, or receiving stolen property(if offeror checks "have", the offeror shall also see 52.209-7, if included in this solicitation);
    (C) Are [ ] Are not [X] presently indicted for, or otherwise criminally or civilly charged by a governmental entity with, commission of any of the offenses enumerated in paragraph (a)(1)(i)(B) of this provision.
    (D) Have [ ] Have not [X] , within a three-year period preceding this offer, been notified of any delinquent

*Figure 18 Page 5 of FAR DFARS Certification report.[28]*

Recall that McCormack directed the inducements in relation to the Department of Justice made by Shire in January 2017.

---

[25] To replicate out search, please go to www.sam.gov, search records, Keyword: MiMedx, click view details, reps & certs, download FAR & DFARS docs -
[26] https://www.nextscience.com/wp-content/uploads/2015/09/Next_Science_Wolcott_Study_Press_Release_7.12.17.pdf
[27] See footnote 26
[28] From SAM MiMedx FAR DFARS Certification Document

13

While the settlement is not an admission of guilt, it is worth noting that when an employee is **named** as the director of such a scheme it would be prudent to let the authorities know. The number senior staff previously from Advanced BioHealing now working at MiMedx listed in section 3 lend weight to this claim.

*Viceroy's consultations with experts in the field were inconclusive as to whether this is in breach of the FAR & DFARS. However, the consensus was: if in doubt to disclose it anyway. One specialist refused to comment as he had serious reservations as to why employees named in Department of Justice documents would be employed.*

**MiMedx may argue McCormack is not a principal of MiMedx, ==however FAR & DFARS definitions entirely disagree with any such suggestion.==**

> (iv)  The taxpayer has filed for bankruptcy protection. The taxpayer is not delinquent because enforced collection action is stayed under 11 U.S.C 362 (the Bankruptcy Code).
> (ii)  The Offeror has  [  ] , has not [X] , within a three-year period preceding this offer, had one or more contracts terminated for default by any Federal agency.
> (2)   "Principals," for the purposes of this certification, means an officer, director, owner, partner, or a person having primary management or supervisory responsibilities within a business entity (e.g., general manager; plant manager; head of a division or business segment; and similar positions).
> This Certification Concerns a Matter Within the Jurisdiction of an Agency of the United States and the Making of a False, Fictitious, or Fraudulent Certification May Render the Maker Subject to Prosecution Under Section 1001, Title 18, United States Code.

*Figure 19 Definition of principals and senior employees.[29]*

This **definition of principals includes McCormack and more than 15 others ex-Advanced BioHealing employees** currently at MiMedx. It is not for us to clarify whether MiMedx should disclose the conduct of its principals and senior personnel. However, due to the recent nature of the Shire settlement and the serious accusations within, we find it hard to believe this was considered fully.

Even more concerning: the person that filed the certification allegedly worked for a competitor for nearly two years and had left the company 3 months before allegedly filing MiMedx FAR/DFAR certification.

**Once more we must bring in to question what the VA will make of this; and we do not believe it will be favorable.** Bear in mind that even a temporary suspension of MiMedx's ability to sell to the VA will have a **material impact on its sales.**

## Viceroy's investigation is ongoing

The question Viceroy will be asking SAM.GOV as part of our ongoing investigation into MiMedx's affairs is:

*Does Sean McCormack's and the numerous other Advanced BioHealing staff's employment by MiMedx constitute a material disclosure in relation to previous conduct in Federal violations and fraud?*

*If Don Ayers was not working at MiMedx, can he sign the FAR and DFAR report?*

---

[29] SAM MiMedx Definition of principals March 2017

### 3.    Advanced BioHealing Employee headcount

As we have mentioned above, McCormack and Ayers are not the only Advanced BioHealing alumnus at MiMedx. **A LinkedIn search returned approximately 54 ex-Advanced BioHealing employees at MiMedx over the last three years** – many of which are still employed by MiMedx. 38 of 54 were employed at prior to the filing of the False Claim Act suit by Department of Justice[30].

As with McCormack and Ayers, many ABH employees have secured senior positions within MiMedx:

| Name | MiMedx Position | Advanced Bio-Healing/Shire Position |
|---|---|---|
| Sean McCormack | *Director of New Market Initiatives* | Senior Director of Commercial Development |
| Lou Roselli | *Director of Sales Operations* | Senior Account Manager |
| Kris Nitschelm | *Director of Health Policy* | Senior Reimbursement Territory Manager |
| Don Ayers | *National Director of Strategic Accounts (Left January 2017)* | Western US Sales Director |
| Tom Dion | *Vice President of Sales* | Regional Sales Director |
| Pamela McKeown | *Director of Health Policy (Left May 2017* | Reimbursement Manager |
| Adam Dach | *Regional Sales Director Great Plains* | Advanced Tissue Specialist, Regional Sales Director |
| Andrew Sole | *Sales Director, Vice President Sales* | Executive Account Manager |
| Bill Ruff | *Area Vice President of Sales Southeast* | Senior Director of Commercial Operations Greater Chicago Area |
| Don Ayers | *National Director Strategic Accounts (Jan 2017)* | Director of National Accounts |
| Douglas Baddley | *Regional Sales Director, Account Executive* | Senior Account Manager |
| Hal Purdy | *Senior Account Executive VA Hospitals (Left Jan 2017)* | Senior Account Manager |
| Jeff Turner | *Regional Sales Director* | Sales Representative |
| Jess Kruchoski | *Regional Sales Director* | Advanced Technology Specialist |
| Joe Panther | *Regional Sales Manager DFW* | Region Executive Account Manager |
| Michael Fox | *National Vice President Federal and Academic Institutions, Area Vice President, Sales Director* | Central Region Sales Director Federal Markets, Director of Customer Relations |
| Nicholas Andolino | *Vice President of Sales, West* | Advanced Technology Specialist |
| Pamela McKeown | *Director of Health Policy* | Reimbursement Manager, Director Health Policy |
| Pat Alba | *Regional Sales Director* | Regional Sales Director |
| Patrick Humphrey | *Account Executive, Regional Sales Director* | Advanced Technology Specialist |
| Amy Powers | *Area Federal Director and Regional Sales Director Orthopedics, Spine and Sports Medicine (Left March 2017)* | Account Manager |

*Figure 20 Viceroy Analysis of ex-Advanced BioHealing employees at MiMedx[31]*

---

[30] Viceroy used a cut-off date of January 2011 which was prior to the DOJ filing of 29 Jan 2011.
[31] Obtained from LinkedIn.com profile search

These MiMedx personnel are noticeably absent from the Board of Directors and the Management page of MiMedx's website despite the seniority of the roles listed in below.

Parker H. "Pete" Petit | Chairman of the Board and Chief Executive Officer

William C. Taylor | President and Chief Operating Officer

Michael J. Senken | Chief Financial Officer

Alexandra Haden | General Counsel and Secretary

Christopher M. Cashman | EVP and Chief Commercialization Officer

Deborah Dean | Executive Vice President

Brent Miller | Executive Vice President

Thornton Kuntz | Senior Vice President of Administration

Michael W. Carlton | Senior Vice President of Global Sales

Marlene M. DeSimone | Senior Vice President of Corporate Strategic Development

Donald E. Fetterolf, M.D., FACP | Chief Medical Officer

Thomas J. Koob, PhD | Chief Scientific Officer

Frank Burrows | Vice President Clinical and Scientific Liaison

Rebeccah J. C. Brown, PhD | Vice President of Product Development, Regulatory Affairs, and Quality Assurance

Randall Spencer | Vice President of Clinical Innovation

David H. Mason, Jr., M.D. | Vice President of Medical Affairs for Clinical Practice

Dr. I. Mark Landy | Vice President Strategic Initiatives

*Figure 21 Extract of MiMedx's Management page[32]*

## Is MiMedx breaking bad sales habits? Unlikely

The scheme at Advanced BioHealing was one of kickbacks, bribery, and manipulation of the VA hospital system to boost sales of Dermagraft™. Among the activities listed the bribery and kickback scheme was the invitation of VA doctors to speak at training seminars to better educate Advanced BioHealing sales staff on navigation of the VA system.

> 10.    A "sales training" event was a specific agreement in which a company paid a VA clinician up to $3,000 to train company sales personnel how to sell to VA facilities. The "sales training" required the VA clinician to travel to company headquarters, or other locations, to deliver a presentation on how to navigate VA facilities, how to avoid impediments to sales, and on how to reach the people who controlled purchasing in VA facilities.

*Figure 22 Extract from United States vs Todd Clawson[33]*

Many ex-Advanced BioHealing staff would have been at these sessions given their seniority within the sales organization. **We find it unlikely that the practice would have stopped after Advanced-BioHealing given the disproportionate increases in Selling, General and Administrative expenses at MiMedx year-on-year.**

---

[32] http://mimedx.com/about-us?qt-management_tabs=1#qt-management_tabs
[33] Case 2:16-cr-00075-RSL

Viceroy Research Group                                                        www.viceroyresearch.org

MiMedx has previously been the subject of a VA investigation by the Office of the Inspector General of the Department of Health and Human Services when it was issued a subpoena[34]. In his statement, MiMedx CEO Parker "Pete" Petit had this to say about the (at that time, ongoing) Advanced BioHealing investigation:

Petit continued. "We are aware of investigations in the wound care market over the past several years, in particular, the ongoing investigation into the sales and marketing practices of Advanced BioHealing ("ABH"), the original manufacturer of Dermagraft®. We anticipated that the ABH investigation could lead to a review of other industry participants, particularly in view of the fact that several industry participants, including MiMedx and some of our competitors, have hired former ABH employees. We screen all of our applicants very carefully. With respect to former ABH applicants, we sought additional input from some former ABH corporate management who joined MiMedx and who were familiar with the suspected violations and the individuals involved. Approximately 18 months ago, we had confirmation of a violation of our compliance policies, and within 24 hours, that individual was terminated."

*Figure 23 MiMedx Announces Receipt of Civil Subpoena[35]*

Viceroy is perplexed by Pete Petit's logic in in seeking character references of ex-Advanced BioHealing employees from "former ABH corporate management...**who were familiar with the suspected violations and individuals.**"[36]

## The sellside is getting warm

During the legal saga against the two employees turned whistleblowers and subsequent actions against two current and one former employees MiMedx CEO Parker "Pete" Petit was questioned regarding connections of the three staff members involved.

**Joe Munda**

As far as the terminated personnel, just taking a quick look on LinkedIn, I mean all four of them seem to be from the Midwestern region. And I was just wondering; A, how much the Midwest was a contributor to overall revenue; and B, I mean, if we could get to more granular level, how much revenue did these four rest contribute to the overall '16 number?

**Pete Petit**

First of all, not a LinkedIn guy, but you're correct. And three of those four individuals had worked together previously and so on. So, there is old friendships there that kind of seem to stimulate this kind of activity, so that's that. I don't know that we -- anybody sitting in this room at the moment...

*Figure 24 excerpt of MiMedx Q4 2016 earnings call[37]*

We encourage Joe Munda to check more extensively on LinkedIn as our figure currently sits at 54 evidenced as Ex-Advanced BioHealing employees, far above the three involved in the legal claims.

*If MiMedx's CEO is aware that prior employment can lead to potential future problems, why is so much of MiMedx's upper management and sales team Advanced BioHealing alumnus?*

---

[34] http://www.prnewswire.com/news-releases/mimedx-announces-receipt-of-civil-subpoena-300014927.html
[35] See footnote 34
[36] See footnote 34
[37] https://seekingalpha.com/article/4049122-mimedx-groups-mdxg-ceo-pete-petit-q4-2016-results-earnings-call-transcript?part=single

Viceroy Research Group                                                                    www.viceroyresearch.org

### 4.   SEC undisclosed investigation

A FOIA request was made to the SEC, an excerpt of the response is below:

> We are withholding records that may be responsive to your request under 5 U.S.C. § 552(b)(7)(A), 17 CFR § 200.80(b)(7)(i). This exemption protects from disclosure records compiled for law enforcement purposes, the release of which could reasonably be expected to interfere with enforcement activities. Since Exemption 7(A) protects the records from disclosure, we have not determined if other exemptions apply. Therefore, we reserve the right to assert other exemptions when Exemption 7(A) no longer applies.

*Figure 25 Viceroy's FOIA request response*

The general policy of the SEC is to conduct its investigations on a non-public basis, and this is not a formal announcement of an SEC investigation. However, parties we have consulted with and relevant legislation suggest this indeed has the potential to be an on-going undisclosed SEC investigation:

> *5 U.S. Code § 552 - Public information; agency rules, opinions, orders, records, and proceedings*
>
> *(a)  Each agency shall make available to the public information as follows: [...]*
> *(b)  **This section does not apply to matters that are—***
> *(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) **could reasonably be expected to interfere with enforcement proceedings***

*Figure 26 5 U.S. Code § 552 extract [38]*

*More convincingly, MiMedx has recently appointed Luis A. Aguilar, former Commissioner of the SEC, to its Board of Directors. According to MiMedx Mr. Aguilar is a highly accomplished lawyer within industry and private law practice. [39]*

We have little doubt that MiMedx's choice of an ex-SEC commissioner for a director is in anticipation of an SEC investigation: Mr. Aguilar has plenty of experience in being investigated by the Office of the Inspector General (**OIG**) of the SEC.

---

[38] https://www.law.cornell.edu/uscode/text/5/552
[39] http://www.prnewswire.com/news-releases/mimedx-announces-the-addition-of-luis-a-aguilar-to-its-board-of-directors-300425866.html

Viceroy Research Group                                                   www.viceroyresearch.org

The curious case of Luis Aguilar

MiMedx's PRNewswire release was boastful of Aguilar's career & credentials, the entirety of which allegedly would be too long to list:

sponsor of the SEC's first Investor Advisory Committee. Mr. Aguilar has received various honors and awards too long to list in this press release. Some of those distinctions include:

*Figure 27 Extract from MiMedx's press release announcing Mr. Aguilar's Directorship[40]*

Viceroy's investigations show Aguilar was involved in an investigation by the OIG in 2015[41] related to nonpublic information being disclosed to Sarah Lynch, a Reuters reporter.

**Unauthorized Disclosure of Nonpublic Information From Executive Session Commission Meeting**

**Introduction and Summary of Results of the Investigation**

The Securities and Exchange Commission (SEC or agency) Office of Inspector General (OIG) learned from Chair Mary Jo White's Deputy Chief of Staff, Erica Williams, that Commissioner Michael Piwowar had raised concerns to Chair White about the unauthorized disclosure of nonpublic information from a Commission meeting. Specifically, Commissioner Piwowar expressed concerns that the results of the Commission's deliberations and voting during a September 12, 2013, Executive Session Commission Meeting about J.P. Morgan had been disclosed, without authorization, to Sarah Lynch, a reporter from Reuters. OIG investigators met with (b)(6),(b)(7)(C) on September 18, 2013. (b)(6),(b)(7)(C) told the OIG that (b)(6),(b)(7)(C) had a telephone conversation with Lynch on September 17, 2013, during which Lynch recited details about the September 12, 2013, Executive Session that were nonpublic. *See* September 19, 2013, Memorandum of Activity (MOA), Receipt of Complaint. Subsequently, the OIG opened an investigation into the unauthorized disclosure of nonpublic information.

*Figure 28 Extract from Report of Investigation Case# OIG 601*

Records show that, "the OIG determined that a Commissioner and two SEC staff members had separately spoken with Lynch and one SEC staff member had spoken with Reuters reporter Emily Flitter around the time that the information was improperly disclosed. The OIG also found that one of those employees may have confirmed certain information."

**F.  An SEC Commissioner and Three SEC Employees Spoke to Reuters Reporters**

The OIG determined that, in addition to Lynch's call (b)(6),(b)(7) three of the 53 SEC employees interviewed spoke with Lynch and one SEC employee spoke with Flitter around the time nonpublic information about the September 12, 2013, Executive Session was improperly disclosed.

*Figure 29 Extract from Report of Investigation Case# OIG 601*

Reviews were conducted of Luis Aguilar's telephone records and other communications. It was substantiated that Aguilar did speak with the reporter concerned on two occasions and in person once, albeit suggested during an Open Meeting (See Figure 30 Below).

[40] http://www.prnewswire.com/news-releases/mimedx-announces-the-addition-of-luis-a-aguilar-to-its-board-of-directors-300425866.html
[41] https://www.sec.gov/foia/docs/oig-601.pdf

1. **Commissioner Luis Aguilar**

A review of Commissioner Aguilar's desk telephone records disclosed four calls placed to one of Lynch's telephone numbers between September 12 and 19, 2013, including one telephone call made approximately 35 minutes after the conclusion of the Executive Session on the J.P. Morgan matter.[1] *See* September 24, 2013, MOA, Review of Commissioner Aguilar's Telephone Call History.

Specifically, we noted outgoing calls to Lynch on September 12, 2013, at 3:50 p.m.; September 13, 2013, at 11:11 a.m.; and September 16, 2013, at 6:06 p.m. *Id.* The OIG's review disclosed that each of these calls showed a duration of zero (0) minutes.[2] *Id.* The OIG noted an additional outgoing call to Lynch on September 19, 2013, at 4:58 p.m., which lasted 26 minutes, 1 second. *Id.* Commissioner Aguilar told the OIG that he could state with "pretty high certainty . . . at least 99.99% sure" that he did not talk to Lynch about the J.P. Morgan deliberations and voting results from the September 12, 2013, Executive Session. *See* October 9, 2013, MOA, Interview of Commissioner Aguilar.

A September 17, 2013, email from Lynch to Commissioner Aguilar, at 1:36 p.m., stated, "Good to see you today, however brief," indicating that he saw Lynch on that day. *See* October 9, 2013, MOA, Email Search. According to building access records, Lynch was in the SEC headquarters building for an Open Meeting on September 17, 2013. *See* December 5, 2013,

*Figure 30 Extract from Report of Investigation Case# OIG 601 – review of Aguilar's telephone records*

While the investigation did not determine who the source of the disclosure of non-public information was, its findings are of interest. Importantly, the OIG did find the following,

II.  **Other Matters**

   **A. Commissioner Aguilar Emails**

   During the course of reviewing emails for this investigation, the OIG determined that Commissioner Aguilar sent nonpublic information related to enforcement matters to his personal

*Figure 31 Extract from Report of Investigation Case# OIG 601 – Page 13*

email account. *See* October 9, 2013, MOA, Email Search. Specifically, between September 22 and 27, 2013, Commissioner Aguilar sent 11 emails with a total of 13 attachments containing nonpublic information. *Id.* In an interview with the OIG, Commissioner Aguilar stated that he could not print documents at home when connecting to the SEC network through his G-On and, as a result, forwarded emails to his personal email account when he needed to print certain documents. *See* October 9, 2013, MOA, Interview of Commissioner Aguilar.

Commissioner Aguilar stated that he did not view sending nonpublic SEC information to his personal email account as a problem and was not aware that doing so violated the SEC's Rules of the Road. *Id.* However, the OIG determined that Commissioner Aguilar had completed annual Security and Privacy Awareness Training, most recently on September 10, 2013, that discussed the Rules of the Road and, specifically, the prohibition on sending nonpublic information to personal email accounts. *See* January 14, 2014, MOA, Receipt of Cybersecurity Training Materials.

*Figure 32 Extract from Report of Investigation Case# OIG 601 – Page 14*

In summary: **despite having annual Security and Privacy Awareness Training just 12 days prior specifically with "the prohibition on sending nonpublic information to personal email accounts",** Aguilar did not view sending nonpublic SEC information to his personal email account as a problem.

In the interests of objectivity, the OIG Conclusions are published in full in Figure 33 below:



### Conclusion

The OIG investigation found that nonpublic information about the J.P. Morgan Executive Session was in a September 17, 2013, article by Flitter, Goldstein, and Lynch, and a September 26, 2013, article by Lynch and Viswanatha. The OIG was unable to conclude which specific individual or individuals improperly disclosed nonpublic information from the Executive Session. Further, we did not identify any emails from SEC staff forwarding information or providing details of the Executive Session to Lynch or any other member of the press.

The OIG determined that [(b)(6) (b)(7)(C)] and Commissioner Aguilar spoke with Lynch and that [(b)(6) (b)(7)(C)] spoke with Flitter around the time that nonpublic information was disclosed, and [(b)(6) (b)] may have confirmed information obtained by Lynch.

The OIG's review of SEC telephone and BlackBerry records identified the following calls to Lynch during the relevant time period: (1) [(b)(6) (b)(7)(C)] Lynch on September 17, 2013; (2) Commissioner Aguilar to Lynch on September 12, 13, 16, and 19, 2013; and (3) [(b)(6) (b)(7)(C)] Lynch on September 19, 2013. In addition, [(b)(6) (b)(7)(C)] made calls to Lynch on September 17, 2013.

The OIG found evidence that Commissioner Aguilar had sent nonpublic information to his personal email account from his SEC email account contrary to the SEC's Rules of the Road. In addition, [(b)(6) (b)] had used [(b)] personal email account to communicate with and provide Commission-related information to reporters [(b)(6) (b)(7)(C)] and subsequently forwarded those emails to [(b)] SEC email account.

We have concluded our investigation and are referring the report to the Commission for appropriate action.

*Figure 33 Extract from Report of Investigation Case# OIG 601 – Page 16*

*What due-diligence was done into Luis Aguilar's time at the SEC before his appointment to Director?*

*Was Aguilar appointed to fend off the suspected SEC investigation?*

*Will Aguilar be able to print his confidential emails from his MiMedx account or will he have to send them to his personal email?*

Viceroy Research Group                                    www.viceroyresearch.org

## 5.    Channel-stuffing allegations and AvKare

The Kruchoski-Tornquist Saga

Jess Kruchoski and Luke Tornquist are two former MiMedx employees-turned-whistleblowers over what appeared to be an internal pay dispute. They claim to have communicated to management their issues regarding the company's revenue recognition policy and acts of channel-stuffing at MiMedx.

The scheme was alleged to have occurred in the following manner:

1. Sometime **prior to the end of the fiscal quarter sales representatives would be pressured by management to stock shelves at VA hospitals with MiMedx products.**
2. MiMedx sales representatives would take it upon themselves **to manage inventory control of MiMedx products at VA hospitals, without knowledge or consent of the VA hospital.**
3. MiMedx sales reps would place orders for EpiFix and other products on behalf of VA hospitals – **without consent of the VA hospitals** – even if there was an existing oversupply.
4. These products would be ordered through MiMedx's government distributor, AvKare, although AvKare would never have control, liability, or ownership of the product. Sales to AvKare are booked as revenue.
5. At some point later, **the product is feathered back to MiMedx, the losses from returns concealed by future revenues.**

The scheme allegedly operates with full knowledge and support of management.

**While some of these allegations have been withdrawn we find their statements pertinent as they describe an organization-wide practice of channel-stuffing.** Further many of the individuals mentioned in their recounting of events are ex-ABH employees.

| Mr. Kruchoski: | And yet here we are right now in this moment doing something that was an ABH—like total 100-percent ABH go-to, stocking freezers, loading freezers. Let's give them a number so that we can inflate that stock price. That's just crazy to me. And the thing is we already have our—we do this |

*Figure 34 Extract from Jess Kruchoski v. MiMedx Group, Inc. [42]*

---

[42] Case 1:17-cv-00577-LMM Kruchoski. v. MiMedx Group, Inc.,

## 2015 shareholder lawsuit channel-stuffing allegations

We find it curious that a shareholder claim was **filed in 2015 against MiMedx for improper disclosure of notice of an OIG investigation**. While the majority of the statements are unrelated to this topic, the last statement is of great importance when viewing the Kruchoski-Tornquist saga:

> 31.    According to confidential sources, including former Regional Territory Sales Managers of the Company, MiMedx senior management routinely demanded that MiMedx Sales Mangers add extra products to open purchase orders in order to boost sales.  For example, one former Sales Manager explained that once a client agreed to purchase MiMedx's products, the client and the Company set up an open or standing purchase order to facilitate future orders. Management then pressured the Sales Manager to pad the purchase order with extra products.  If a client ordered two or three devices, the Sales Manager was pressured to "up that order" to five or six.  According to the former Sales Manager, "[i]f the client ever questioned the order or invoice, I was told to tell them that I added more products because I knew they would need more product in the future."

*Figure 35 Extract from Lawrence J. Long, et al. v. MiMedx Group, Inc., et al.[43]*

The allegations made *in Lawrence J. Long, et al. v. MiMedx Group, Inc., et al.* are very similar to those made by Kruchoski: **a sales manager was under pressure from management to ship excess product towards the end of the quarter to boost revenue.**

Another key point to Kruchoski's statements are the irregularities in revenue recognition within MiMedx. The claims center on the sales made to AvKare; Kruchoski alleges that as AvKare never exercised any control over the product nor liability for returns the sales should not have been recorded.

## AvKare's 2014 OIG investigation

The VA Office of the Inspector General investigated AvKare's status as a "manufacturer" on their FSS in 2014 coming to the conclusion that AvKare was in fact a "distributor". The distinction is important as distributors must submit Commercial Sales Practices (CSP) data for **each supplier**. CSP data consists of "commercial pricelists and...information regarding their commercial pricing/discounting practices". In order to bypass this requirement, AvKare continued to maintain that it was a "manufacturer" and submitted a letter of supply from itself, to itself. The OIG was not impressed.

> AvKARE was considered a "distributor of the offered products, not the manufacturer" because "[t]he offered products are never in the possession of AvKARE throughout the process." Id. at 20954. Instead, the products were "shipped in bulk containers from the
>
> manufacturer of the product" to a non-AvKARE packager, packaged, and then shipped to another non-AvKARE entity for distribution. Id.

*Figures 36 & 37 Extract from AvKare, Inc. vs United States of America Bid Protest[44]*

Clearly AvKare exercised extremely minimal control over the product, acting more as a shopfront and FSS provider than an actual manufacturer. The whistleblowers claim that unless AvKare assumed various return and warranty liabilities for MiMedx products, the revenue from those sales should not have been recognized. MiMedx's reluctance to disclose its exact relationship with AvKare in this regard is covered in section 5 of this report.

---

[43] Case 1:15-cv-01221-A Lawrence J. Long, et al. v. MiMedx Group, Inc., et al
[44] BID PROTEST No. 15-1015C

While no connection was ever made by the two OIG investigations (MiMedx and AvKare), MiMedx announced receipt of a civil subpoena from the Office of the Inspector General of the Department of Health and Human Services on the 31st of December 2014.

## Mid-South Biologics vs MiMedx

Viceroy Research has obtained documents regarding an ongoing legal dispute between Mid-South Biologics LLC and MiMedx[45]. Mid-South claims a bad faith breach of contract and misuse of vendor credentials on the part of MiMedx.

Mid-South alleges that MiMedx signed a consulting agreement and was entitled to referral fees for each Prospect (customer it brought to MiMedx), one of which is AvKare. Further **Mid-South claims MiMedx misused its vendor credentials to sell to Saint Francis hospital Memphis.**

*As part of the complaint a subpoena for the contracts between MiMedx and AvKare was lodged. MiMedx put up a vigorous effort to quash the subpoena claiming undue burden and proprietary knowledge **despite a protective order in place.***

**The movement to quash was eventually denied and Viceroy perceives MiMedx's aggressive litigation practices and defensiveness regarding a supply contract as a red flag.**

*Why are the allegations of channel-stuffing so persistent in MiMedx legal actions?*

*What liabilities were assumed by AvKare in the sales of MiMedx products?*

*Why is MiMedx so reluctant to supply the AvKare contract to the courts?*

---

[45] Case 2:17-cv-02028-JTF-egb Mid South Biologics, LLC vs MiMedx Group, INC

### 6.    Related party channel stuffing allegations

**SLR Medical Consulting - Channel stuffing allegations**

SLR Medical Consulting is a Texas company primarily concerned with the sale of medical solutions to medical professionals including MiMedx products[46]. SLR Medical's President and CEO is MiMedx ex-employee **Jerry Morrison who claims to have been President/CEO of SLR Medical from January 2010 through to present.** Curiously <mark>he was also a Sales Director at MiMedx during this time from July 2013 through September 2015.</mark>



*Figure 38 & 39  Extracts from Jerry Morrison's LinkedIn[47]*

<mark>SLR Medical was also named in another of Kruchoski's statements (see Section 5) as an alleged MiMedx channel stuffing vehicle whose operations were facilitated by MiMedx.</mark>

> 72.  SLR Medical Consulting is a medical distributor that also had a stock and bill arrangement with MiMedx. Upon information and belief, MiMedx entered into an agreement with SLR Medical Consulting whereby SLR Medical Consulting would make end of the quarter order of MiMedx products at MiMedx's request on highly favorable financing terms.
>
> 73.  In order to facilitate the storage of the excess orders, MiMedx provided SLR Consulting with freezers to store the product. On information and belief, the product was stored in the residence of a former MiMedx representative that had gone to work for SLR Consulting. The MiMedx account representative for SLR Consulting was the MiMedx Vice President of Sales, Mike Carlton, and that account was treated as a house account at MiMedx.
>
> 74.  As of June 2016, SLR Consulting carried a 60 day past due balance of over $3 million with MiMedx. Only one MiMedx account carried a higher past due balance at the time, and that account was also a "house account" directly under Mike Carlton's control.

*Figure 40 Extract from Kruchoski vs MiMedx[48]*

---

[46] http://www.slrmedicalconsulting.com/
[47] https://www.linkedin.com/in/jerry-k-morrison-a8771a3/
[48] Kruchoski vs MiMedx Case No.: 50-2016-CA-013806-XXXX-MB Filing #9739508

Viceroy Research Group                                                                    www.viceroyresearch.org

*MiMedx appears to have facilitated the channel stuffing of businesses such as SLR by extending favorable financing AND allowing SLR to keep the stock it has purchased at MiMedx facilities![49]*

**Increases our conviction that MiMedx is uninvestable.**

Further, we question whether Morrison was in breach of his non-compete while working at MiMedx. Morrison's involvement with both companies **simultaneously** taken with Tornquist's statement paint a disturbing picture of MiMedx's network of related party resellers.

## StreamLogix LLC

StreamLogix, LLC is a company owned by MiMedx employee Frank Braly. SpineLogix, LLC is a co-owner of StreamLogix LLC. SpineLogix operates a sales platform on which it sells only a large variety of MiMedx products.



*Figure 41 Extract of SpineLogix Website[50]*

SpineLogix was formed in 2011 by a Corey Heinz, currently a Stryker Pharmaceutical employee. However, a 2016 filing obtained by Viceroy Research shows that ownership and control over the business was Braly and StreamLogix.

---

[49] Kruchoski vs MiMedx Case No.: 50-2016-CA-013806-XXXX-MB Filing #9739508
[50] https://spinelogixllc.com/shop/

Viceroy Research Group                                                                    www.viceroyresearch.org



*Figure 42 Extract of StreamLogix, LLC Certificate of Formation*

Frank H Braly has been a MiMedx employee since November 2015, as of filings dated the 6th of April 2016 he is still a managing member of StreamLogix LLC.



*Figure 43 Extract from Frank Braly's LinkedIn[51]*

We question whether this apparent related party activity is in breach of MiMedx's non-compete agreement.

A strange connection between SLR Medical Consulting and SpineLogix is that they both hired the same sales representative: Kari Sanders. While we do believe in coincidences, we do not think it applies when an individual works at two separate companies owned by individuals who were both MiMedx employees at the time.

---

[51] https://www.linkedin.com/in/frank-braly-a5992333/



*Figure 44 Extract from Kari Sander's LinkedIn profile*[52]

*Was SLR Medical Consulting reselling MiMedx products while its President/CEO was a Sales Director at MiMedx?*

*Is MiMedx aware of Frank Braly's side-business selling MiMedx products?*

*If so, how many other employee-owned distributors is MiMedx selling to and what is the quality/nature of these sales?*

*If not, how weak are the controls in place for detecting this behavior?*

[52] https://www.linkedin.com/in/kari-sanders-212a68108/ another profile is likely https://www.linkedin.com/in/kari-sanders-3b426b108/

Viceroy Research Group                                         www.viceroyresearch.org

### 7. Stability Biologics

**MiMedx acquired Stability Biologics in January 2016 for consideration of $10m (60% cash, 40% stock), plus an earn-out consideration.** Stability Biologics is a human tissue products provider to the healthcare industry which closely aligns with MiMedx's business model – push supply, indications of channel-stuffing and human tissue products.

MiMedx's 2016 accounts illustrate an indicative, pro-forma 2015 revenue figure as though Stability Biologics had been acquired January 1, 2015 of $204m. Actual 2015 revenue was $187m, which indicates Stability would have contributed $17m to sales.

The following unaudited pro forma summary financial information presents the consolidated results of operations for the Company as if the acquisition had occurred on January 1, 2015. The pro forma results are shown for illustrative purposes only and do not purport to be indicative of the results that would have been reported if the acquisition had occurred on the date indicated or indicative of the results that may occur in the future.

Unaudited pro forma information for the twelve months ended December 31, 2016 and 2015 (in thousands) is as follows:

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2016 | 2015 |
| Revenue | $245,563 | $204,481 |
| Net income | $12,611 | $24,960 |
| Income per share, fully diluted | $0.11 | $0.22 |

*Figure 45 Evaluation of disclosure controls and procedures[53]*

Management continued to indicate that revenue growth was largely impacted by the Stability acquisition:

The increase of $57.7 million in 2016 revenue as compared to 2015 includes approximately $21.1 million in volume from market share gains and market expansion as well as the addition of in excess of 1,600 new customers due to the increase of our direct sales force and new customers added as part of the acquisition of Stability Biologics. Overall pricing was $15.3 million favorable and was impacted by a continued shift from distributor to direct sales and product mix was $ 21.3 million favorable primarily due to the sale of new products including those from Stability Biologics.

*Figure 46 Evaluation of disclosure controls and procedures[54]*

Given the implied value placed on Stability Biologics by management, it perplexed us as to why MiMedx would suddenly divest the Stability business for just $3.5m in promissory notes.

> *Further digging showed that the acquisition of Stability was another disastrous managerial decision which we believe was swept under the rug, following a theme of deceptive behaviors demonstrated by management.*

## Sub-standard manufacturing & indication of channel-stuffing

First, it was reported that while management originally believed Stability's manufacturing processes were at standards aligned to MiMedx, this was not the case:

During the measurement period, management determined that the initial PFI should be adjusted to better reflect an expected case from a market participant's perspective. At the time of the acquisition, management believed that certain of the acquired company's products had reached certain marketability milestones. Management subsequently concluded that these milestones had indeed not yet been achieved. Also, at the time of the acquisition Management believed that certain manufacturing processes were at standards aligned with our overall company standards. Management subsequently concluded that the standards required improvements. These factors have resulted in a lower revenue trajectory in the periods that apply to the earn-out thus reducing the fair value of the earn-out.

*Figure 47 Stability Biologics manufacturing standards[55]*

---

[53] FY 2016 financial statements – pg. 64
[54] FY 2016 financial statements – pg. 42
[55] FY 2016 financial statements – pg. 63

Viceroy Research Group                                                                 www.viceroyresearch.org

Perhaps as a consequence of Stability's implied sub-standard manufacturing process, there was some sort of cooling-off negotiation with Stability's prior shareholders **due to expired/returned inventory, to the tune of US$3.5m:**

> **15. Related Party Transactions**
>
> On January 13, 2016, when the Company completed the acquisition of Stability Inc., d/b/a Stability Biologics ("Stability") there was an assumed payable of $5,954,555 to a related party. The Company made payments of $1,361,030 during 2016. The payable was further reduced by $3,367,250 as a result of the return or destruction of expired inventory. The outstanding payable at 12/31/16 is $1,226,275 and is included in Accounts Payable. The related party is a limited liability company that is controlled by a former stockholder of Stability Inc. who is now an employee of the Company.

*Figure 48 Stability Biologics manufacturing standards[56]*

Viceroy believes this incident suggests that Stability Biologics was – you guessed it – **channel-stuffing.** We believe that MiMedx was actually unaware of these activities until the mass return of expired stock. Somewhat ironically, MiMedx managed to acquire a business with some serious symptoms of channel stuffing.

## The greatest earn-out of all time

The earn-out arrangement for Stability was immense. Stability stockholders were eligible – perhaps by accident – to the 2016 and 2017 sum of the gross profit of:

- Stability products sold by Stability sales team;
- Stability products sold by MiMedx's sales team; AND
- MiMedx products sold by the Stability sales team.

> The Merger Agreement provides for the payment of initial merger consideration of $10,000,000 (the "*Closing Merger Consideration*"), subject to adjustment pursuant to the terms of the Merger Agreement, payable to Stability's stockholders 60% in cash and 40% in shares (the "*Closing Merger Shares*") of the Company's common stock, par value $0.001 per share (the "*Common Stock*"), at a per share price of $9.07 based on the average closing price of the Common Stock on Nasdaq for the thirty (30) day period preceding the second trading day prior to the closing date, and the assumption of certain of Stability's outstanding indebtedness. In addition to the Closing Merger Consideration, the Company has also agreed to pay additional consideration ("*Earn-Out Consideration*") based upon Stability's performance through December 31, 2017. Pursuant to the terms of the earn-out arrangement, the Company will pay, for each of the years ending December 31, 2016 and 2017, an amount equal to one times the gross profit margin from (a) the net sales of Stability products sold by Stability's or the Company's sales personnel and (b) the net sales of Company products sold by Stability's sales personnel; provided, however, if the amount of such net sales for either earn-out period is less than $12 million, the earn-out amount will decrease to 0.5 times the gross profit margin for such earn-out period. The Earn-Out Consideration will also be payable 60% in cash and 40% in shares of Company stock (the "*Earn-Out Shares*"). The number of Earn-Out Shares to be issued for the respective earn-out periods will be calculated by dividing 40% of the dollar amount of the Earn-Out Consideration represented thereby by the average closing price of the Common Stock for the thirty day period preceding the applicable payment date. The Company will have the right to setoff certain indemnification claims against the Earn-Out Consideration.

*Figure 49 Stability Biologics' earn-out arrangement[57]*

Considering that Stability's sales team consisted of 100 independent sales representatives[58], and MiMedx's gross margin is extremely high, this was bound to be extremely problematic (we cannot ascertain Stability's gross margin from documents sourced - we assume they were also very high but not as much as MiMedx).

As far as earn-outs go, **this is perhaps one of the best deals of all time – all gross profit, high margins, two years, no ceiling.**

The pro forma revenue table generated by MiMedx on Figure 45, which indicates Stability would have contributed ~US$17m to sales. If we assume both entity's COGS are similar, that means Stability's earn-out could be in the region of ~US$15m for both 2016 *and* 2017.

MiMedx never paid Stability its earn-out.

---

[56] FY 2016 financial statements – pg. 63
[57] MiMedx Group Form 8-K – Jan 13, 2016 – Merger Agreement with Stability Biologics pg. 2
[58] MiMedx Group Form 8-K – Jan 13, 2016 – Merger Agreement with Stability Biologics pg. 95

The fallout, cover-up, and addition of more related party distributors.

Given the above, management threatened to sue the former Stability stockholders in relation to breaches of representation, and agreed to indemnify the Stability Stockholders on the provision the earn-out fees were offset against losses incurred due to these breaches of representation.



**MEMBERSHIP INTEREST PURCHASE AGREEMENT**

THIS MEMBERSHIP INTEREST PURCHASE AGREEMENT (**"Agreement"**) is entered into as of August 18, 2017 (the **"Execution Date"**), by and among MiMedx Group, Inc., a Florida corporation (**"MiMedx"**), Stability Biologics, LLC, a Georgia limited liability company (successor-in-interest to Stability Inc., a Florida corporation) (**"Stability LLC"**), each person that was a stockholder of Stability Inc., a Florida corporation and a predecessor-in-interest to Stability LLC (**"Stability Inc."**), as of January 13, 2016 (the **"Stockholders"**), and Brian Martin, as stockholder representative (**"Stockholder Representative"**). Each of such parties is individually referred to herein as a **"Party"** and collectively as the **"Parties."**

**RECITALS**

WHEREAS, pursuant to that certain Agreement and Plan of Merger (the **"Merger Agreement"**), dated as of January 10, 2016, by and among MiMedx, Titan Acquisition Sub I, Inc., a Florida corporation and a wholly-owned subsidiary of MiMedx (**"Merger Sub"**), Titan Acquisition Sub II, LLC, a Georgia limited liability company and a wholly-owned subsidiary of MiMedx (**"Merger Sub II"**), Stability Inc., certain of the stockholders of Stability Inc., and the Stockholder Representative, MiMedx acquired one hundred percent (100%) of the capital stock of Stability Inc. in a transaction in which Merger Sub was merged with and into Stability Inc. and the surviving company from such merger was merged with and into Merger Sub II (collectively, the **"Merger"**), and in connection with the Merger, each outstanding share of common stock of Stability Inc. was converted into the right to receive the Merger Consideration (capitalized terms used but not defined herein shall have the meanings ascribed in the Merger Agreement);

WHEREAS, the Merger Agreement provides for MiMedx to pay Earn-Out Consideration based upon Stability LLC's financial performance during certain specified periods;

WHEREAS, MiMedx has threatened to assert indemnification claims against the Stockholders under the Merger Agreement with respect to alleged breaches of representations and warranties contained therein and contends that the Stockholders may be obligated to make payments to MiMedx and other Parent Indemnitees in satisfaction of such claims or in respect of which MiMedx may be entitled to offset losses related thereto against Earn-Out Consideration under the Merger Agreement;

WHEREAS, on the terms and subject to the conditions set forth herein, the Parties desire to enter into this Agreement in order to (i) provide for the resolution of such indemnification claims under the Merger Agreement by setting off the Earn-Out Consideration in full in respect of such indemnification claims, (ii) provide for MiMedx's sale of one hundred percent (100%) of the equity interests in Stability LLC (the **"Stability LLC Interests"**) to the Stockholders for the other consideration set forth in this Agreement, and (iii) grant the other covenants, releases and agreements set forth herein;

NOW, THEREFORE, in consideration of the premises and of the mutual agreements, representations, warranties, provisions and covenants herein contained, and other good and

*Figure 50 Evaluation of disclosure controls and procedures[59]*

The business was sold back to its original founder, Brian Martin, for $3.5m in promissory notes secured against Stability Biologics' assets, which almost entirely consisted of "Customer relationships" and "Patents and know-how" – at the time of acquisition, Stability had a net tangible asset deficiency of $1.9m[60].

Pete Petit announced that the divesture was due to a new strategic path which had no room for Stability (pun intended):

> Petit added, "We have determined that the Stability Biologics business is not a strategic fit with our new focus on becoming predominantly a biopharmaceutical company. While we believe the potential of Stability Biologics products continues to be significant, we expect to have better return on investment (ROI) opportunities in biopharma compared to those in the cadaver tissue category. A major incentive for the MiMedx acquisition of Stability Biologics was its independent sales representative organization. As part of the transaction, MiMedx will retain access to this sales rep organization via a distributor agreement with Stability. This group of sales reps will continue to focus on certain areas of our surgical business."

*Figure 51 Gross Margin defined[61]*

---

[59] MiMedx Group Form 8-K – August 18, 2017 – Divesture of Stability Biologics pg. 4
[60] FY 2016 financial statements – pg. 62
[61] http://www.prnewswire.com/news-releases/mimedx-signs-definitive-agreement-to-divest-stability-biologics-subsidiary-as-part-of-companys-strategic-focus-on-biopharma-300506633.html

Viceroy find it doubtful that a change of strategy influenced the divesture of Stability, however we will generally agree that there are potentially "better return on investment (ROI) opportunities in biopharma."

Despite all the nonsense – MiMedx has signed on Stability Biologics as a sales distributor, adding to MiMedx's long list of related party distributors.

*The Stability Biologics deal represents the pinnacle of managerial incompetency and financial illiteracy. Viceroy believe red flags such as this make MiMedx uninvestable.*

## 8.   Internal controls & change of auditors

MiMedx's auditors, Cherry Bakaert, **identified a material weakness in the company's financial controls** in the period ending 31 December 2016:

Material weakness: In reviewing the Company's tax accounting in preparation for filing this Form 10-K, our management identified a deficiency in our internal control over financial reporting that is described below in Management's Annual Report on Internal Control Over Financial Reporting. Our management has concluded that this deficiency constitutes a material weakness in our internal control over financial reporting related to our accounting for income taxes. This material weakness did not result in a material misstatement of the Company's annual financial statements for the year ended December 31, 2016. However, management concluded that this material weakness, if un-remediated, could have resulted in a material misstatement of the Company's annual or interim consolidated financial statements that would not have been prevented or detected by our internal controls. Accordingly, management determined that this control deficiency constituted a material weakness. We have developed a remediation plan for this material weakness, which is described below.

*Figure 52 FY 2016 - Evaluation of disclosure controls and procedures[62]*

Fortunately for MiMedx, this material weakness was picked up by auditors. Viceroy believes that material weaknesses in financial controls are a major red flag and significantly increase audit risk. This is especially the case when after six months, MiMedx had still not remediated its material weakness in internal controls:

When fully implemented and operational, we believe the measures described above will remediate the material weakness we have identified and generally strengthen our internal control over financial reporting. The material weakness will not be considered remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively. Our goal is to remediate this material weakness by the end of the 2017 fiscal year, subject to there being sufficient opportunities to conclude, through testing, that the enhanced control is operating effectively.

*Figure 53 Q2 2017 - Evaluation of disclosure controls and procedures[63]*

*Viceroy finds it concerning that MiMedx proceeded to replace its auditors in the midst of this internal control issue*

Item 4.01      Changes in Registrant's Certifying Accountant

(a) The Audit Committee (the "Committee") of the Board of Directors of MiMedx Group, Inc. (the "Company") recently conducted a competitive selection process to determine the Company's independent registered public accounting firm for the fiscal year ending December 31, 2017. The Committee invited several public accounting firms to participate in this process. As a result of this process, the Committee approved the appointment of Ernst & Young LLP ("Ernst & Young") as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2017 effective August 4, 2017. This action effectively dismissed Cherry Bekaert LLP ("Cherry Bekaert") the Company's independent registered public accounting firm for the fiscal year ended December 31, 2016, as the Company's independent registered public accounting firm as of August 4, 2017.

*Figure 54 Change in MiMedx accountant – Form 8-K[64]*

Cherry Bekaert had audited MiMedx since 2008.

---

[62] FY 2016 financial statements – pg. 80
[63] Q2 2017 financial statements – pg.32
[64] MiMedx Group Form 8-K – August 4, 2017 – Changes in Registrant's Certifying Accountant pg. 2

Viceroy Research Group                                                    www.viceroyresearch.org

## 9.   Tornquist and the contract

Viceroy has obtained a 2014 invoice from a VA hospital for purchases of EpiFix. At the time MiMedx did not have a Federal Supply Schedule (FSS) allowing it to sell directly to government entities and claimed they sold their product to AvKare who then sold it on to government entities. Recently MiMedx has acquired their own FSS and claimed that once the contract expired in mid-2017 they would have cut out the middle man.

The invoice tells a different tale; the middle man hasn't been in the picture for a long time.



**B. Item Information:** Accounting and Appropriation Data

| Funding Amount as Verified by POC | Station Code | BOC & Fund Control Point |
|---|---|---|
| $5,190.02 | 618 | 913 |

Detailed Description of Item/Aid

SURGICAL IMPLANT-EPIFIX

Consult/Reference* Identification
*IEN 6684 plus station identifier (e.g. Veteran's Last Initial and last 4 digits of the Veteran's SSN (for filtering purposes))

26995-30

**C. Detailed Procurement Information:**   Provide the following information

List any Mandatory Sources (these are referred to as National Committed Use Contracts). Add Waiver req't if not used.

NA

NOTE: Per VHA Handbook 1761-1 these would require waivers if the standardized contracts are not used.

List any Federal Supply Schedule (FSS) National or Local Contract Numbers utilized

V797P-4076b

Vendor Name

AVKARE

| Vendor Point of Contact Info Name | VISTA/IFCAP Vendor # |
|---|---|
| LUKE TORNQUIST | 53162 |

| Fax Number, Phone Number, or eMail Address to Send Documents for POC above | Date Item/Service Required |
|---|---|
| 866-967-0134/931-292-6222    AvKare Phone number | Aug 4, 2014 |

| Delivery Information | Delivery Address (if "Other") |
|---|---|
| Other | ALREADY IMPLANTED, 7/28 |

| Payment Only? | Consult Type | Consult Date | Quote Date |
|---|---|---|---|
| Yes | Payment Only | Jul 28, 2014 | Jul 28, 2014 |

*Figure 55 Invoice from VA Hospital listing MiMedx Employee as Vendor[65]*

There are several inconsistencies in the form:

- The **fax number (866-967-0134) was confirmed by AvKare as not theirs but MiMedx's**
- The contact, Luke Tornquist, was a MiMedx employee at the time not an AvKare employee[66]
- The FSS number is under AvKare's name; a 10-year federal supply schedule

We believe that this is significant as the above facts show that during the time of this contract (which is still ongoing) all documents and invoices would presumably be faxed to MiMedx, not AvKare. Any phone calls however would be fielded by AvKare making this what appears to be a thinly veiled front for MiMedx to sell directly to the government through AvKare's FSS number.

[65] https://www.hashdoc.com/documents/621014/avkare-luke-invoice
[66] https://www.linkedin.com/in/luke-tornquist-5217017/

Viceroy Research Group                                                    www.viceroyresearch.org

Further investigation also showed that MiMedx and AvKare's prices on the **exact same product are only differentiated by a cent in price**:

| CATALOG NUMBER | CONTRACT NUMBER | BPA CONTRACT NUMBER | GSA | FV | PRODUCT LONG DESCRIPTION | CONTRACTOR NAME | PRICE | BPA PRICE | SIN |
|---|---|---|---|---|---|---|---|---|---|
| EI-5050 | V797D-40303 | | X | | EpiFix Micronized 40mg | MiMedx Group, Inc. | $725.00 | | A-20C |
| EI-5125 | V797D-40303 | | X | | EpiFix Micronized 100mg | MiMedx Group, Inc. | $1625.00 | | A-20C |
| EI-5200 | V797D-40303 | | X | | EPIFIx Micronized 160mg | MiMedx Group, Inc. | $2334.00 | | A-20C |
| GS-5160 | V797D-40303 | | X | | EpiFix 16 mm Disc | MiMedx Group, Inc. | $895.00 | | A-20C |
| GS-5230 | V797D-40303 | | X | | EpiFix 2 X 3 cm | MiMedx Group, Inc. | $1144.00 | | A-20C |
| GS-5440 | V797D-40303 | | X | | EpiFix 4 X 4 cm | MiMedx Group, Inc. | $2595.00 | | A-20C |
| GS-5560 | V797D-40303 | | X | | EpiFix 5 X 6 cm | MiMedx Group, Inc. | $2995.00 | | A-20C |
| GS-5770 | V797D-40303 | | X | | EpiFix 7 X 7 cm | MiMedx Group, Inc. | $6685.00 | | A-20C |
| GS-5230 | V797P-4076B | | X | | EpiFix 2x3cm | AvKARE, Inc. | $1144.00 | | A-20C |
| GS-5440 | V797P-4076B | | X | | EpiFix 4x4cm | AvKARE, Inc. | $2595.01 | | A-20C |
| GS-5770 | V797P-4076B | | X | | EpiFix 7x7cm | AvKARE, Inc. | $6684.68 | | A-20C |
| GS-5160 | V797P-4076B | | X | | EpiFix 16mm Disk | AvKARE, Inc. | $895.01 | | A-20C |
| EI-5050 | V797P-4076B | | X | | EpiFix Micronized 40mg | AvKARE, Inc. | $725.01 | | A-20C |
| EI-5125 | V797P-4076B | | X | | EpiFix Micronized 100mg | AvKARE, Inc. | $1625.01 | | A-20C |
| EI-5200 | V797P-4076B | | X | | EpiFix Micronized 160mg | AvKARE, Inc. | $2334.00 | | A-20C |
| GS-5560 | V797P-4076B | | X | | EpiFix Amniotic Allograft 5x6cm | AvKARE, Inc. | $2995.01 | | A-20C |

*Figure 56 MiMedx product pricing[67]*

MiMedx and AvKare are competing on a one cent difference on the following products:

- EpiFix 4x4cm
- EpiFix 16mm
- EpiFix Micronized 40mg
- EpiFix Micronized 100mg
- EpiFix Amniotic Allograft 5x6cm

*Why is a MiMedx fax number on an AvKare invoice?*

*Why is a MiMedx employee listed as the point of contact on an AvKare invoice?*

*Why are MiMedx and AvKare's prices differentiated by a one-cent difference across half its range?*

---

[67] Go to www.va.gov/nac/medsurg/list and enter "EpiFix" in the "Search by item name" field

Viceroy Research Group                                           www.viceroyresearch.org

## 10.   Conclusion

*Viceroy believe the evidence we have uncovered makes MiMedx uninvestable.*

Our research strongly suggests that **MiMedx is under investigation by the SEC and puts the company at serious risk of losing its ability to supply government agencies**, which makes up a substantial portion of MiMedx's income.

**Make no mistake**: MiMedx is dancing on thin ice. **Direct business with the Veterans Affairs hospitals is estimated to be ~25% of MiMedx's revenue in 2016,** and we anticipate the VA will take action against MiMedx on the back of evidence contained in this report. **Given the McCormack connection, channel-stuffing allegations and the silent cadre of ex-Advanced BioHealing employees operating within the company,** we believe the **VA revenue stream will soon run dry for MiMedx.**

Viceroy confirms that we are not associated or employed by a competitor or associated with authors of previous reports on MiMedx. This will save MiMedx the time of alleging anything to the contrary. Further, Viceroy has only utilized public information. If MiMedx is in any doubt about the seriousness of their employee associations, they should immediately download the Department of Justice claims that highlight the conduct of specific individuals.